645 F.2d 1102
 207 U.S.App.D.C. 177
 PUERTO RICO MARITIME SHIPPING AUTHORITY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Trailer Marine Transport Corporation, Sea Land Service,
Inc., International Longshoremen's Association, American
Trucking Association, Inc., Federal Maritime Commission,
Houston Port Bureau, Inc. et al., South Carolina State Ports
Authority, Intervenors.
 No. 79-2228.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 5, 1980.
Decided March 27, 1981.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Morris R. Garfinkle, Washington, D.C., with whom Amy Loeserman Klein, Olga Boikess and Kathleen Mahon, Washington, D.C., were on the brief, for petitioner and intervenors, South Carolina State Ports Authority and Houston Port Bureau, et al.; Richard D. Gluck, Washington, D.C., also entered an appearance, for petitioner.
 Gordon M. Shaw, Atty., Federal Maritime Commission, Washington, D.C., with whom Edward G. Gruis, Deputy Gen. Counsel, Federal Maritime Commission, Washington, D.C., was on the brief, for intervenor, Federal Maritime Commission.
 Kathleen M. Dollar, Deputy Associate Gen. Counsel, I.C.C., Washington, D.C., with whom Richard A. Allen, Gen. Counsel, I.C.C., Washington, D.C., Sanford M. Litvack, Asst. Atty. Gen., New York City, Barry Grossman and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Robert B. Nicholson, Atty. Dept. of Justice and Henri F. Rush, Counsel, I.C.C., Washington, D.C., also entered appearances for respondents.
 
 
 1
 Michael Joseph, Washington, D.C., with whom John Cunningham, Washington, D.C., was on the brief, for intervenor, Trailer Marine Transport Corp.
 
 
 2
 Nelson J. Cooney, Kenneth E. Siegel and Alan J. Thiemann, Washington, D.C., were on the brief, for intervenor, American Trucking Associations, Inc.
 
 
 3
 Thomas W. Gleason, New York City, was on the brief, for intervenor, International Longshoremen's Ass'n, Inc.
 
 
 4
 Donald J. Brunner, Washington, D.C., entered an appearance for intervenor, Sea Land Service, Inc.
 
 
 5
 Before McGOWAN, Chief Judge, and WRIGHT, Circuit Judge, and GASCH,* United States District Judge for the District of Columbia.
 
 
 6
 Opinion for the court filed by Chief Judge McGOWAN.
 
 McGOWAN, Chief Judge:
 
 7
 This is a proceeding to review an order of the Interstate Commerce Commission, in which the Commission accepted for the first time exclusive jurisdiction over tariffs naming joint motor/water through rates in trade between the United States and Puerto Rico. In large part the Commission reversed its longstanding previous practice on the strength of Trailer Marine Transport v. Federal Maritime Commission, 602 F.2d 379 (D.C.Cir. 1979) ("TMT" ), in which a panel of this court held that the ICC may exercise exclusive jurisdiction over tariffs naming joint rail/water through rates in the same trade. For the reasons that follow, we affirm the Commission's extension of TMT to motor/water as well as rail/water through rates.
 
 
 8
 * Trailer Marine Transport ("TMT") is a common carrier by water which operates between ports in the United States and Puerto Rico. Prior to August 1977, TMT operated a single-rate, all-water service between Puerto Rico and Florida. In 1977, however, TMT filed with the Interstate Commerce Commission a tariff naming through rates for a new rail/water intermodal service for the joint carriage of goods[1] between points within the continental United States and seaports in Puerto Rico. Pursuant to this tariff, TMT would transport goods on the marine segment of the route and various independent rail carriers would transport the goods within the continental United States. Customers would pay one through rate, to be apportioned between the rail and water carriers according to the terms of their agreement. The Commission accepted exclusive jurisdiction over the tariff, and the joint service commenced operation on November 8, 1977.
 
 
 9
 Shortly thereafter, TMT filed a tariff similar to the one previously approved, except that the continental segment of the journey would be assumed by motor rather than rail carriers (a provision hereinafter termed a "joint motor/water through rate"). The ICC rejected this tariff, however. TMT filed for reconsideration, but the ICC upheld its previous determination.
 
 
 10
 Meanwhile, the Federal Maritime Commission ("FMC") filed suit in the United States District Court for the District of Columbia, attempting to set aside the ICC's assertion of exclusive jurisdiction over joint rail/water through rates. The FMC believed that it alone had the power to regulate or accept tariffs with respect to the marine segment of the joint through routes operating between the United States and Puerto Rico. On review, however, this court upheld the ICC's assumption of exclusive jurisdiction over rail/water through rates. Trailer Marine Transport v. Federal Maritime Commission, 602 F.2d 379 (D.C.Cir. 1979).
 
 
 11
 Immediately after the TMT opinion issued, TMT petitioned the ICC to reconsider its conflicting decision with respect to joint motor/water rates, arguing that the TMT opinion requires the Commission to take a more expansive view of its powers with respect to traffic in the Puerto Rico trade. The ICC agreed and, on September 10, 1979, handed down the decision now on review.
 
 
 12
 In its decision upon reconsideration, the ICC reversed its position and for the first time asserted exclusive jurisdiction over tariffs naming joint motor/water through rates in the Puerto Rico trade. The Commission based its decision on the TMT court's findings that (1) Puerto Rico is a "possession" of the United States for purposes of the Interstate Commerce Act ("the Act"), and (2) that the "limitation clause" contained in section 10501 of the Act (and quoted almost verbatim in section 10521, which pertains to motor carriers) is to be read only to prevent ICC regulation of intra-territorial traffic, not to prevent ICC regulation of any particular portion of the United States/Puerto Rico journey. Trailer Marine Transport v. FMC, 602 F.2d at 392-93. The court had also found that the FMC has no jurisdiction over the marine leg of the United States/Puerto Rico trade, which makes the ICC's jurisdiction exclusive, a ruling which the Commission apparently believed to be applicable to motor/water services as well.
 
 
 13
 On October 12, 1979, Puerto Rico Maritime Shipping Authority ("PRMSA"), a common carrier by water owned by the Government of Puerto Rico, petitioned the ICC to reject TMT's tariff on the grounds that the Commission had no jurisdiction even to accept filings pertaining to the marine leg of a joint through route between Puerto Rico and the United States, much less to assert exclusive jurisdiction over the entire route. The ICC rejected this petition, and refused to stay the tariff pending review by this court. The Court of Appeals eventually stayed the operation of that tariff pending review.[2]
 
 
 14
 Numerous parties have since intervened on both sides of the dispute. Supporting the ICC's order are Trailer Marine Transport, progenitor of the tariff which began the dispute, and American Trucking Associations, Inc. The major opponent of the order is the Federal Maritime Commission, as well as various municipal and state shipping authorities which have intervened to protect the livelihood of certain ports operating along the Puerto Rico/United States shipping lines.[3] The International Longshoremen's Association, AFL-CIO, and Sea Land Service, Inc., have also joined in the brief urging reversal of this order.
 
 II
 
 15
 The issues in this case are two: (1) whether the ICC has the authority to accept and regulate tariffs naming joint rates entered into by motor carriers and water carriers operating between the United States and Puerto Rico, and if so, (2) whether this jurisdiction reposes exclusively in the ICC or concurrently in the ICC and FMC. The first issue turns upon our construction of the Interstate Commerce Act, Part II, which is the statutory authority for the ICC's regulation of motor carriers.
 
 
 16
 The Interstate Commerce Act, Part II, grants the Interstate Commerce Commission general jurisdiction over motor transportation in the following instance, inter alia:
 
 
 17
 (a) Subject to this chapter and other law, the Interstate Commerce Commission has jurisdiction over transportation by motor carrier ... to the extent that passengers, property, or both, are transported by motor carrier
 
 
 18
 (1) between a place in
 
 
 19
 (C) The United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;[4]
 
 
 20
 Section 216(c) authorizes the establishment of joint through routes between motor and other common carriers for the purpose of facilitating efficient and cheaper transportation of goods. It provides:
 
 
 21
 A carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall establish through routes as follows:
 
 
 22
 (4)(A) A motor common carrier of property may establish through routes and joint rates ... with other carriers of the same type, with rail and express carriers, and with water common carriers ....[5]
 
 
 23
 Last, Section 217(a) requires a motor carrier to file with the Commission any tariffs "containing the rates for transportation it may provide under this subtitle (Part II)."[6]
 
 
 24
 These statutes, read together, go far toward resolving the present dispute. First, they indicate that Congress, in enacting Part II, contemplated that the ICC might play some role in the regulation of motor traffic that is not purely "interstate" in character. This is obvious from the varied categories of ICC jurisdiction, apart from merely interstate powers, that are enumerated in section 203(a).[7] Also enlightening is the fact that motor carriers have carte blanche to enter into joint arrangements with other forms of common carriers, specifically carriers by water. Third, the section 217(a) requirement that motor carriers "shall" file tariffs with the ICC answers the question of whether TMT correctly filed with the ICC tariffs at least for that portion of the joint service provided by motor carriers within the continental United States.
 
 
 25
 We note also that section 217(a) is phrased broadly, perhaps to encompass every phrase of a joint service that includes an ICC-regulated motor carrier. As such, if the narrow question were merely whether the ICC might accept the filing of a tariff naming joint motor/water rates, the logic of these statutory provisions in toto could well require our answer in the affirmative.
 
 
 26
 But the Interstate Commerce Act fails to answer unequivocally the crucial question of whether the ICC is subject to some jurisdictional limitation that prevents its substantive regulation of tariffs pertaining to the marine segment of the United States/Puerto Rico trade. This is hardly a frivolous contention, although we ultimately find it to be without merit. The limits of ICC jurisdiction are set forth in section 203(a)(1)(C), which provides that the ICC may regulate motor carriers operating "between a place in ... the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States." (emphasis added). Petitioner PRMSA argues that the so-called "limitation clause" emphasized above imposes a strict geographic limitation upon the ICC's authority and precludes the ICC from exercising any regulatory power over the marine segment of a joint through route between the United States and Puerto Rico. Indeed, this was the view of the ICC itself prior to the issuance of TMT.[8]
 
 
 27
 In TMT, however, a panel of this court held that the limitation clause pertaining to joint rail/water through routes between the United States and a possession should not be interpreted as a strict geographic limitation, and should be extended only as necessary to effectuate its purpose. We think these two factual situations, rail/water and motor/water through routes, are virtually identical, and that the reasoning of TMT compels a similar result here. Since the intricacies of TMT are central to our decision, we discuss it below.
 
 III
 
 28
 Trailer Marine Transport v. Federal Maritime Commission, 602 F.2d 379 (D.C.Cir. 1979) ("TMT "), involved the ICC's assertion of exclusive jurisdiction over joint rail/water through routes between the United States and Puerto Rico. The ICC's jurisdiction over rail transportation is set out in Part I of the Interstate Commerce Act, which provides that
 
 
 29
 (a) ... the Interstate Commerce Commission has jurisdiction over transportation
 
 
 30
 (1) by rail carrier ... (and) water common carrier ...
 
 
 31
 (2) to the extent the transportation is in the United States and is between a place in
 
 
 32
 (c) a State and a place in a territory or possession of the United States.
 
 
 33
 49 U.S.C. § 10501 (Supp.1980). Rail carriers are also permitted to establish joint rail/water routes, in section 10703, and are required to file tariffs, in section 10762.[9]
 
 
 34
 Speaking for a panel that included Judges McGowan and Wright, Judge Wilkey framed the "limitation clause" issue as follows:
 
 
 35
 (T)he crux of the contention must be that the limitation clause bars ICC regulation over the marine portion of the present trade because water carriers while en route from any state of the United States to Puerto Rico necessarily pass outside the geographic bounds of the "United States" by crossing the "high seas."
 
 
 36
 Trailer Marine Transport v. FMC, 602 F.2d at 387. After an exhaustive examination of the legislative history and prior codifications, Judge Wilkey upheld the ICC's exercise of exclusive jurisdiction. The court noted that the purpose of limitation clause in Part I is quite clear from the legislative history: to avoid jurisdictional conflicts between the United States and foreign countries. He saw no reason to apply the limitation clause any further than was necessary to fulfill its purpose, because such a broad application would be contrary to precedent. Id. at 392.
 
 
 37
 Despite PRMSA's elaborate arguments to the contrary, we think that TMT forecloses this court from reading the limitation clause as a strict geographic limitation without further examining the statute's purpose. Although the court in TMT dealt with rail carriers, controlled by Part I of the Interstate Commerce Act, and we deal with motor carriers, controlled by Part II, the situations are analogous, as the Commission realized upon reconsideration.
 
 
 38
 The first point of analogy is the strongest: both limitation clauses are identically phrased. They restrict ICC jurisdiction "to the extent the transportation is in the United States."[10] Although in other contexts courts have noted that different subsections of the ICA are to be construed independently of each other, courts have never foreclosed similar interpretations when the provisions are identical in language and otherwise suitable for similar interpretation.[11] Such is the case here. Both disputes arose primarily because of the unique status of Puerto Rico: not as a foreign country, into and around which ICC jurisdiction obviously does not extend, nor as a state, in which case the ICC could clearly regulate transportation to and from Puerto Rico without regard to any geographic limitation. The facts in TMT and in the present case differ only in the mode of transportation used to effect the mainland segment of the joint route. Similar solutions to legal questions arising from these two limitation clauses thus seem intuitively appropriate.
 
 
 39
 But we base our decision on something stronger than the mere facial similarity between the two cases. We think that the TMT court phrased its holding so broadly as to apply by its own terms to the present case.
 
 
 40
 The court first compared the previous and current codifications of section 10501, the limitation on ICC jurisdiction over water carriers, and concluded that if the first clause did not seem to import a "strict geographic limitation" neither could the second because Congress, in recodifying the ICA, expressly provided that the recodification would not change the substance of the ICA.[12] This aspect of TMT is inapplicable to the present case. Id. at 389. The TMT court did not, however, ground its opinion on this examination. Rather, it went on to decide the issue by examining previous courts' treatment of different geographic limitation clauses found throughout the Act, a discussion which bears heavily upon our decision in the present case.
 
 
 41
 In surveying the numerous instances in which other courts have interpreted the ICA, Judge Wilkey noted that previous courts have uniformly declined to impute a strict geographic limitation to the ICC's jurisdiction and instead have examined the purpose and effect of the limitation in the specific case. For instance, in Canada Packers v. Atchison, Topeka & Santa Fe Ry., 385 U.S. 182, 87 S.Ct. 359, 17 L.Ed.2d 281 (1966), the Court had declined a strict geographic interpretation of a limitation clause that would have prevented ICC determinations of the reasonableness of joint through international freight rates between a state and Canada. Cases such as this concerned the application of various limitation clauses, not merely the statute pertaining to rail carriers.
 
 
 42
 After surveying numerous such cases, Judge Wilkey found
 
 
 43
 a total absence of legal precedent to support the contention of the FMC that the limitation clause has some purpose other than to bar an extension of the United States agency jurisdiction into a foreign domain where, for reasons of international comity, it cannot go; and judging from the cases, even the barrier imposed by foreign boundaries on ICC jurisdiction has been found to be somewhat elastic.[13]
 
 
 44
 He cited as the "principal authority on point" United States v. Pennsylvania Ry. Co., 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945), in which the Supreme Court addressed the question of whether the limitation clause in Part I bars ICC jurisdiction over that portion of a rail/water through route occurring on water even when the joint service merely passes out of the United States into foreign waters briefly, on its way to another point in the United States. The Court in Pennsylvania Ry. adopted a functional, not literal, interpretation of the limitation clause, noting that the power conferred on the ICC to regulate trade "from any place in the United States" "to the extent the transportation is in the United States through a foreign country to any other place in the United States" would "have little meaning, if the limiting clause were given the (strict geographic) interpretation." Id. at 622 n.12, 65 S.Ct. at 476 n.12.
 
 
 45
 The TMT court's choice of precedents, and especially its discussion of Pennsylvania Ry., are most revealing, and clearly signal to us that the court's expansive holding applies in the present case. None of these cases, least of all Pennsylvania Ry., turned on factors unique to rail regulation. As Judge Wilkey recognized,
 
 
 46
 (t)he contention that the logic of the Supreme Court's opinion decision in Pennsylvania Ry. must be confined to the issue of foreign railroad transportation also misses the mark. Factually, Pennsylvania Ry. is quite closely on point for present purposes since it dealt with joint through rail/water routes passing through foreign waters, and with regulations that the ICC sought to impose on carriers engaged in the transport of goods on the extraterritorial water segments of such voyages.[14]
 
 
 47
 The same set of facts as those emphasized above are also present in the context of motor/water joint through routes.
 
 The TMT court continued:
 
 48
 Furthermore, the railroad cars carried by train and boat in Pennsylvania Ry. had the same commercial purpose as the containerized cargos shifted between train and boat at issue in the present case. The principal factual difference between Pennsylvania Ry. and the present case is that the former dealt with interstate shipments via a foreign port, while the present case deals with shipments between inland points of the United States and a port of a United States "possession."[15]
 
 
 49
 The present case is even closer to the rail/water case than was Pennsylvania Ry., since the present case involves transportation in the same trade for the "same commercial purpose", the difference being only the mode of transportation used to effect mainland carriage of goods. In short, the same logic that made Pennsylvania Ry. applicable to TMT also makes TMT persuasive authority in the present case.
 
 
 50
 We conclude, then, that any distinctions between the facts of the present case and TMT are distinctions without a difference. We adopt the TMT court's method of analysis, and will examine the purpose of the limitation clause, rather than woodenly adopt a strict geographic limitation.[16]
 
 IV
 
 51
 Because of its numerous amendments and recodifications, section 203 is accompanied by a voluminous legislative history which allows us clearly to discern the purpose of the limitation clause. As with the clause at issue in TMT, the clause in section 203 was added only to correct a defect in the previous codification, not to effect any sweeping changes in the jurisdiction of the ICC.
 
 
 52
 Prior to the 1950's, ICC jurisdiction was limited to transportation in interstate commerce or foreign commerce, which were defined in sections (a)(10) and (a)(11) so as not to include territories or possessions.[17] Nor did the definition of "state" in section (a)(8) cover territories or possessions. As a result, the ICC was without power to regulate any joint service's through route that began or ended in any territory or possession of the United States. In fact, the ICC had no control over even the mainland portion of such a journey.
 
 
 53
 As PRMSA noted in its brief, anomalous situations resulted, and manufacturers shipping within the United States or to foreign countries were at a competitive disadvantage compared to shippers to or from Puerto Rico, who could transport free of ICC control.[18] Congress became aware of the problem, and a bill was introduced to plug the hole. The first attempt to extend ICC jurisdiction to transportation to and from the territories was H.R. 5237, a bill introduced in the House in 1949, which would have changed the definition to "state" in section (a)(8) to include "territories and possessions."[19]
 
 
 54
 The legislative history of H.R. 5237 reveals that it was intended to grant the ICC the same jurisdiction over traffic between the United States and Puerto Rico as it had over traffic between the several United States, which includes incidental traffic over water.[20] In the Subcommittee hearings, the Subcommittee described the purpose of its proposed amendment:
 
 
 55
 As revealed in the hearings on H.R. 5237 ..., in at least one instance the Commission found itself powerless to act on protests by the Galveston Chamber of Commerce and rail lines in Texas and Louisiana alleging discriminatory practices by certain motor-common carriers in Texas with respect to traffic originating in Puerto Rico. This defect in the law is further emphasized by the fact that commerce by motor vehicle destined to or originating in Cuba is subject to Interstate Commerce Commission regulation but similar commerce to or from Puerto Rico is not subject to regulation.[21]
 
 
 56
 To remedy this problem, Congress proposed to change the definition of "state" to include territories and possessions. H.R. 5237 would then, it was thought, give the ICC "the same power over motor-truck carriers in the handling of traffic to or from United States Territorial possessions as it has under part I ... in connection with shipments moving via rail."[22]
 
 
 57
 The bill was subsequently amended, however, and enacted with the limitation cast approximately in its current form: "insofar as such transportation takes place within the United States."[23] The reasons for this change are clearly explained in the legislative history. As the House Committee noted in its report,
 
 
 58
 H.R. 5237 was technically deficient in that ... as written, it might have granted jurisdiction over motor carrier traffic within Territories or possessions, whereas the objective of the bill was to give the Commission authority only over that part of motor transportation, in commerce to and from Territories and possessions, which physically occurs within the forty-eight States and the District of Columbia.[24]
 
 
 59
 As the Senate Committee Report further elaborated,
 
 
 60
 The additional jurisdiction ... was clarified by the clause 'insofar as such transportation takes place within the United States' in order to make clear that the jurisdiction of the Commission does not extend to such transportation within possessions and territories.[25]
 
 
 61
 We think that the limitation clause was added to section 203 only to make clear that the ICC was to have no jurisdiction over motor transportation taking place within the territories or possessions.
 
 
 62
 PRMSA's arguments to the contrary, that the language quoted above actually reveals Congress's intent to treat transportation to and from the territories as foreign commerce, is unpersuasive, for it is based on one passage taken out of context: the above-quoted statement that the amendment was intended only to confer ICC jurisdiction over that part of the "motor transportation ... which physically occurs within" the 48 states. When read in the context of the entire statement, it is clear that this phraseology served merely to distinguish between that part of the "motor transportation" occurring within the United States and that occurring within a territory or possession. While the particular quotation is misleading as it stands alone, it certainly loses that ambiguity when relegated to its proper place within the paragraph.
 
 
 63
 Furthermore, one such phrase cannot counterbalance the clear indications throughout the legislative history that the limitation clause was adopted solely because the preferred amendment changing the word "state" to include "territories or possessions" might have led to ICC regulation of intra-territorial transportation. This concern is, in itself, a persuasive indication that Congress envisioned traffic between the United States and territories much as it envisioned interstate commerce. If traffic to and from possessions such as Puerto Rico were treated as "foreign" commerce, there would be no question of ICC regulation within the states; ICC regulation of transportation occurring within states, however, has long been an item of hot contention. In short, then, PRMSA alternates between proving too little and proving too much.
 
 
 64
 Finally, PRMSA's argument must fail because it is clear beyond cavil that the limitation clause itself was added to section 203 solely for the purpose of foreclosing ICC regulation of transportation within the territories or possessions, and thus equalizing the competitive standings of merchants shipping interstate and in foreign trade and those shipping in the United States/Puerto Rico trade. While we think it clear that Congress was specifically contemplating treatment of joint services between Puerto Rico and the United States similar to its treatment of interstate commerce, this factor is not crucial to our determination. In light of TMT, it is only important that, in enacting the limitations clause, Congress was concerned with a problem completely apart from the imposition of a strict geographic limitation on ICC jurisdiction, and this is obviously true. The legislative history never even mentions joint motor/water transportation.
 
 
 65
 Thus, we conclude that the "limitation clause," while on its face a possible bar to ICC jurisdiction in this case, actually does not operate to preclude ICC regulation of the marine segment of a joint motor/water through route between the United States and Puerto Rico. Finding no jurisdictional limitation which would preclude the ICC from regulating any particular portion of the through route in this case, we think it clear that the remaining sections of the ICA do not prevent the ICC from accepting and substantively regulating tariffs naming joint motor/water through rates. As we noted above, section 216(c) expressly authorizes the establishment of through rates between motor carriers and "water common carriers," and section 217(c) requires motor carriers to file tariffs naming any through rates it may establish with other carriers. We can find no other bar to the ICC's exercise of jurisdiction in this instance, and find PRMSA's other arguments to the contrary to be without merit.[26]
 
 
 66
 * * * * *
 
 V
 
 67
 The FMC has advanced one final argument against the ICC's order. It is that the FMC's concurrent jurisdiction over the marine leg of the United States/Puerto Rico trade requires a division of regulatory jurisdiction between the ICC and FMC. In other words, the FMC contemplates a type of bifurcated authority similar to that approved by this court in Commonwealth of Pennsylvania v. ICC, 561 F.2d 278, 289 (1977), cert. denied, 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978). In that case, this court upheld an ICC order in which the ICC accepted the jurisdiction to require the filing of joint international through rates established between domestic rail, motor, or water carriers and ocean liners, but would substantively regulate only the inland portion of the joint through rate, leaving regulation of the marine leg of the journey to the FMC. In the present case, the FMC would have us style a similar bifurcated system.
 
 
 68
 Such a division of regulatory responsibility is both unnecessary and impermissible in this case. As the court in TMT recognized, Commonwealth of Pennsylvania involved a unique set of circumstances.[27] In that case, the ICC itself limited its substantive regulation to the mainland portion of the joint through rate, in an attempt to effect a compromise solution staving off conflict between the Interstate Commerce Act and the Shipping Act of 1916, which together authorized regulation of these joint through routes by both the ICC and the FMC.[28]
 
 
 69
 But any jurisdiction the FMC may have over joint motor/water through rates in the Puerto Rico trade is controlled by a different statute completely. As this court held in TMT, the Intercoastal Shipping Act, 46 U.S.C. § 844 (Supp. II 1978), sets out the limits of FMC jurisdiction with respect to through routes between the States or between a State and a territory or possession.[29] The court went on to address directly the issue at hand:
 
 
 70
 (The Intercoastal Shipping Act) in the only language that pertains to through routes, appears to restrict FMC through route jurisdiction in interstate commerce (in contrast with FMC jurisdiction in foreign commerce set forth in the Shipping Act) to those through routes that extend in their entirety from the coastal points on one water carrier's route to the coastal points on another water carrier's route, i. e., that extend no further than from port to port.[30]
 
 
 71
 In sum, it was established in TMT that the FMC has no jurisdiction over the "marine segment" of a through route that begins or ends at an inland point. Accordingly, there can be no bifurcated jurisdiction over the present intermodal rates in any event, and the ICC's assertion of exclusive jurisdiction is not only appropriate, but necessary lest there be a gap in ICC regulation comparable to that which spawned the addition of the limitation clause in the first place.[31]
 
 
 72
 For the reasons stated above, we conclude that the ICC properly asserted exclusive jurisdiction over tariffs naming rates for joint motor/water through routes between the United States and Puerto Rico, and we affirm the ICC's order accordingly.
 
 
 73
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a)
 
 
 [1]
 A "joint through rate" is a single charge published by one carrier and concurred in by connecting carriers as the rate that will apply in a through movement of cargo from a point of origin on the line of one carrier to a point of destination on the line of the other. Commonwealth of Pennsylvania v. ICC, 561 F.2d 278, 281-82 (D.C.Cir. 1977), cert. denied, 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978)
 When two carriers of different modes of transportation (e. g., motor carrier and water carrier) enter into a tariff providing for a through rate, the rate may also be termed an "intermodal rate."
 
 
 [2]
 PRMSA alleged that these new tariffs would divert traffic from numerous Eastern seaboard ports, force PRMSA to curtail service to those ports, and result in widespread loss of jobs. Moreover, PRMSA argued that the new ICC assertion of jurisdiction will disrupt shipping patterns established over a 40-year period. By order of October 23, 1979, this court granted PRMSA's motion to stay the ICC order pending review
 
 
 [3]
 Joining in the brief for petitioner PRMSA were, inter alia, (1) the Board of Commissioners of the Port of New Orleans, (2) Houston Port Bureau, Inc., and (3) the South Carolina State Ports Authority. They alleged harm similar to that alleged by PRMSA. See note 2 supra
 
 
 [4]
 Section 203(a)(1)(C), 49 U.S.C.A. § 10521 (Supp.1980) (as amended in 1978). This court's decision in Trailer Marine Transport v. Federal Maritime Commission, 602 F.2d at 385 n.26, established that Puerto Rico is to be considered a "possession" of the United States for purposes of the Interstate Commerce Act. Therefore, section 203(a)(1)(C) is applicable to the present case. Other subsections provide for transportation taking place between two of the United States and between the United States and a foreign country. See note 7 infra
 
 
 [5]
 Section 216(c), 49 U.S.C.A. § 10703(a)(4)(A) (Supp.1980) (emphasis added)
 
 
 [6]
 Section 217(a), 49 U.S.C.A. § 10762(a)(1) (Supp.1980)
 
 
 [7]
 In addition to its provisions with respect to interstate commerce, section 203(a)(1) also provides for ICC jurisdiction over motor carriers in the following instances:
 (1) between a place in
 (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
 (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
 (E) the United States and a place in a foreign country to the extent the transportation is in the United States; and
 (2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.
 49 U.S.C.A. § 10521 (Supp.1980).
 
 
 [8]
 In its order reversing its previous decision and accepting exclusive jurisdiction over motor/water through routes, the ICC based its reconsideration solely on the TMT decision. As the Commission noted, in the TMT case the court held that "the limiting clause, used in defining this Commission's jurisdiction, 'within the United States', only serves the purpose of keeping the Interstate Commerce Commission out of the internal affairs of foreign countries." (J.A. 26.)
 The Commission then accepted exclusive jurisdiction and invited TMT to submit a new tariff based on the new Commission policy. Id. TMT submitted a new tariff, which was approved by the ICC but stayed by this court pending appeal. See note 2 supra.
 
 
 [9]
 The same sections apply to motor and rail carriers. For text of these sections in pertinent part, see notes 4-5 and accompanying text supra
 
 
 [10]
 49 U.S.C.A. §§ 10501, 10521. In § 10501, the section pertaining to rail carriers, the limitation clause precedes the enumerated geographic areas of ICC jurisdiction:
 (2) to the extent the transportation is in the United States and is between a place in
 (A) a State and a place in another State;
 (B) a territory or possession of the United States and a place in another such territory or possession.
 49 U.S.C.A. § 10501 (Supp.1980). In § 10521, pertaining to motor carriers, the limitation clause appears after each geographic area involving travel outside the 48 mainland states:
 (1) between a place in
 (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;
 (D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or
 (E) the United States and a place in a foreign country to the extent the transportation is in the United States.
 49 U.S.C.A. § 10521 (Supp.1980).
 Although PRMSA argues that the structure of these statutes in itself differentiates them, and that the structure of § 10501 is somehow less susceptible to a "strict geographic limitation," we can see no meaningful difference between the language of the two statutes. Certainly the previous codification of § 10501 does not reveal any substantive differences between the provisions. In its prior form, § 10501 provided for ICC jurisdiction over rail carriers engaged in transportation.
 (f)rom one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States, or the District of Columbia, or from one place in a Territory to another place in the same Territory, or from any place in the United States through a foreign country to any other place in the United States, or from or to any place in the United States to or from a foreign country, but only insofar as such transportation or transmission takes place within the United States.
 49 U.S.C. § 1(1) (1976) (emphasis added). This statute, as Judge Wilkey noted in TMT is even more ambiguous than the current codification. Trailer Marine Transport v. FMC, 602 F.2d at 387. Certainly it does not clarify PRMSA's argument as to the alleged distinction between the two statutes on their faces.
 
 
 [11]
 In its brief PRMSA cited several cases for the proposition that the different Parts of the ICA are to be interpreted independently of each other. See Brief for PRMSA at 8-9. It is true that the two limitations clauses at issue here are found in different parts of the Interstate Commerce Act. Part I, applying to railroads, was enacted in 1887 as the original Interstate Commerce Act, 49 U.S.C. §§ 1-27 (as recodified at 49 U.S.C.A. §§ 10501-05 (Supp.1980)). Part II, pertaining to motor carriers, was enacted in 1935 as the Motor Carrier Act. 49 U.S.C. §§ 301-27 (as recodified at 49 U.S.C.A. §§ 10521-26 (Supp.1980))
 Nevertheless, while a decision under or interpretation of one Part of the Act should not be per se binding on a court interpreting another Part of the Act, the logic of prior decisions and interpretations need not and, indeed, should not be discounted. The ICC itself has stated that "points decided under part II (or any part of the Act) ... will be considered where informative" in a case involving another part of the Act. Union Barge Line Corporation Applications, 250 I.C.C. 249, 261 (1942). The reasoning of TMT is highly informative, and certainly is not limited to situations involving rail carriers, and therefore we conclude that the TMT court's interpretation of the limitation clause applies to the present case as well. See text accompanying notes 12-16 infra.
 
 
 [12]
 In the 1978 recodification of the Interstate Commerce Act, it was stated that the recodification could not be construed as making substantive changes in the previous law. Pub.L.No. 95-473, Section 3(a) (49 U.S.C. prec. § 10101 note)
 
 
 [13]
 Trailer Marine Transport v. Federal Maritime Commission, 602 F.2d at 390 n.46
 
 
 [14]
 Id. at 392 (emphasis added)
 
 
 [15]
 Id. at 392
 
 
 [16]
 TMT by its terms requires that we interpret the "limitation clause" to apply only insofar as is necessary to accomplish its purpose. Id. at 392-93. Of course, if it appeared that the purpose of the limitation clause in Part II were to restrict ICC jurisdiction over motor carrier services to activity within the mainland United States, TMT would require reversal of the ICC's order. We find, however, that the limitation clause was added to the general grant of ICC jurisdiction for a limited purpose quite unrelated to the separation of "the jurisdictional functions of the ICC and the FMC." Id. at 392. See text accompanying notes 17-26 infra
 
 
 [17]
 Section (a)(10), the predecessor to the general jurisdiction section now at issue, covered motor carrier transportation
 between any place in a State and any place in another State or between points in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water ...
 49 U.S.C. § 303(a)(10) (now codified at 49 U.S.C.A. § 10521(a)(1)(A) & (B) (Supp.1980) (interstate commerce)).
 Section (a)(11) covered motor carrier transportation
 between any place in the United States and any place in a foreign country, or between places in the United States through a foreign country ...
 49 U.S.C. § 303(a)(11) (now codified at 49 U.S.C.A. § 10521(a)(1)(D) (Supp.1980) (foreign commerce)).
 
 
 [18]
 See Brief for PRMSA at 14-15. PRMSA details the problems that arose when certain motor carrier companies entered into a joint agreement and published rates for a service that would transport sugar to the United States from Puerto Rico. The ICC found it was empowered to suspend through rates for services originating in Cuba (another leading supplier of sugar), pending an investigation of the fairness of the rates as to individual regions, but was powerless to control through routes beginning in Puerto Rico, and as a result it could not block a discriminatory rate which caused a great deal of traffic to be diverted from Galveston to Houston. See Sugar from Houston, Tex., to Texas Points, 51 M.C.C. 775, 775-76 & n.2, 782 (1950). This problem was discussed in hearings on H.R. 5237. Proposed Amendments to the Interstate Commerce Act: Hearings on H.R. 5237, 81st Cong., 2d Sess. 2, 6, 9 (1950)
 
 
 [19]
 See Interstate Commerce Act Amendments: Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H.R. 5237, 81st Cong., 2d Sess. 1 (1950)
 
 
 [20]
 49 U.S.C.A. § 10521(a)(1)(A) (Supp.1980). In its current codification, and in the codification effective in 1950, the statute allows ICC jurisdiction over transportation between two states without any application of a limitation clause, except when the transportation between the two points in the United States occurs within a foreign country. 49 U.S.C.A. § 10521(a)(1)(D)
 
 
 [21]
 Interstate Commerce Act Amendments: Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H.R. 5237, 81st Cong., 2d Sess. 1 (1950) (emphasis added)
 
 
 [22]
 Hearings on H.R. 5237, supra note 21, at 2
 
 
 [23]
 H.R.Rep.No. 2481, 81st Cong. 2d Sess. 3 (1950)
 
 
 [24]
 Id. at 2 (emphasis added)
 
 
 [25]
 S.Rep.No. 2258, 81st Cong., 2d Sess. 4 (1950) (emphasis added)
 
 
 [26]
 PRMSA and the FMC have advanced the argument that the language of section 10703 in itself precludes the Commission's regulation of a through route in this instance. Section 10703 provides in relevant part:
 § 10703 Authority for carriers to establish through routes
 (a) A carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title (the grant of general jurisdiction) shall establish through routes as follows:
 (4)(A) A motor common carrier of property may establish through routes and joint rates ... with other carriers of the same type, with rail and express carriers, and with water common carriers, including those referred to in subparagraph (D) of this paragraph.
 (D) A through route or joint rate or classification authorized to be established with a carrier referred to in this subparagraph may be established with a water common carrier providing transportation subject to
 (i) the jurisdiction of the Commission under subchapter III of the chapter 105 of this title (inapplicable in the present case); or
 (ii) section 801 ... and providing transportation of property between Alaska or Hawaii and the other 48 states.
 (emphasis added). PRMSA's contention is based on a tortured interpretation of this section. PRMSA argues that § 10703(a)(4)(A), allowing for the establishment of through routes with motor and other common carriers, allows for the establishment of motor/water through routes regulated by the ICC only in the circumstances described in section (D), also quoted above. Since the motor/water rates at issue herein are not described in section (D), PRMSA concludes that the ICC cannot regulate them.
 The fallacy of this argument is immediately apparent: it contradicts the plain meaning of the statute. Section 4(A) provides that motor carriers regulated by the ICC may establish through rates with water carriers including "those referred to in subparagraph (D)." It is hornbook law that the use of the word "including" indicates that the specified list of carriers that follows is illustrative, not exclusive. Certified Color Mfg. Ass'n v. Mathews, 543 F.2d 284, 296 (D.C.Cir. 1976).
 Furthermore, the legislative history of this section and its predecessor makes clear that the two categories of water carriers described above were illustrative only. See H.R.Rep.No. 1769, 87th Cong., 2d Sess. 2 (1962); Through Routes and Joint Rates: Hearing before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H.R. 7297 & 7343, 87th Cong., 2d Sess. 2 (1962) (remarks of Rep. Staggers).
 
 
 [27]
 Trailer Marine Transport v. FMC, 602 F.2d at 396-97
 
 
 [28]
 561 F.2d at 392
 
 
 [29]
 602 F.2d at 396
 
 
 [30]
 Id. (emphasis original)
 
 
 [31]
 See text accompanying notes 17-25 supra