853 F.2d 1139
 57 USLW 2118, 1988-2 Trade Cases 68,184,
11 Fed.R.Serv.3d 1476
 SANDCREST OUTPATIENT SERVICES, P.A., Plaintiff-Appellant.
v.
CUMBERLAND COUNTY HOSPITAL SYSTEM, INC.; SunHealth
Management Corporation; John Briggs; Franklin
Clark; Wayne Whetsell; Doug Henley;
Perry Harmon; Tom
McCuthcheson,
Defendants-
Appellees.
 No. 87-1713.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 8, 1988.
Decided Aug. 10, 1988.
Rehearing and Rehearing In Banc Denied Sept. 15, 1988.
 
 Elizabeth Fairbank Kuniholm (John R. Edwards, Marian R. Hill, Tharrington, Smith & Hargrove, Raleigh, N.C., on brief), for plaintiff-appellant.
 Michael Terry Medford (Howard E. Manning, Manning, Fulton & Skinner, Raleigh, N.C., on brief), John Gilbert Shaw (Clark, Shaw, Clark, Lingle & Anderson, Fayetteville, N.C., J. Phil Carlton, David W. Long, Susan Kelly Nichols, Poyner & Spruill, John Huske Anderson, James G. Billings, Robin K. Vinson, Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, Richard T. Boyette, Theodore B. Smyth, Patterson, Dilthey, Clay, Cranfill, Sumner & Hartzog, Raleigh, N.C., on brief), for defendants-appellees.
 Before POWELL, Associate Justice (Retired), United States Supreme Court, sitting by designation; WILKINSON, Circuit Judge, and BUTZNER, Senior Circuit Judge.
 
 POWELL, Associate Justice:
 
 1
 The issue presented is whether the district court erred in granting summary judgment in favor of appellees on the question whether they were entitled to immunity from damages pursuant to the Local Government Antitrust Act of 1984. We also consider whether it was improper for the district court to have stayed all discovery, and whether the district court abused its discretion in denying appellant leave to amend its complaint to seek injunctive relief. We affirm the district court in all respects.I
 
 
 2
 Appellant, Sandcrest Outpatient Services, P.A. ("Sandcrest"), is a professional association of emergency room physicians that, from march 1, 1981 until February 28, 1986, provided physician services for the emergency room at Cape Fear Valley Medical Center (the "Medical Center"), a county hospital owned and operated by appellee Cumberland County Hospital System, Inc. ("Hospital System").[1] The Hospital System is a nonprofit corporation that was created, pursuant to North Carolina law, to act as an agency and instrumentality of Cumberland County in operating county-owned hospitals. See N.C.Gen.Stat. Sec. 131-90, et seq. (1981 ed.) (currently codified, as amended, N.C.Gen.Stat. Sec. 131E-1, et seq. (1986)). On December 11, 1985, John Plyler, the director of the Medical Center and the representative of SunHealth Management Corporation ("SunHealth")--a corporation that had managed the Medical Center since the fall of 1985--announced at an executive session of the hospital's Board of Trustees that the Sandcrest contract would not be renewed when it expired on February 28, 1986. A discussion followed, and the next day Plyler informed Sandcrest that its contract would not be renewed. On January 20, 1986, in response to the presentation of a petition signed by 25% of the active medical staff, Dr. Briggs, the Chief of Staff of the Medical Center and a member of the Board of Trustees of the Hospital System, called a special meeting of the medical staff as required by the Medical Staff Bylaws. At the meeting, Briggs explained that the Sandcrest contract would not be renewed and that several emergency room groups had submitted proposals. He advised that an ad hoc committee of staff physicians had been appointed to examine the various bids that had been submitted.
 
 
 3
 On January 22, 1986, two days after the staff meeting, the hospital executed an agreement with Coastal Emergency Services, Inc. for the provision of emergency room services for three years, commencing March 1, 1986. On November 10, 1986, Sandcrest filed this action alleging that appellees--the Hospital System, SunHealth, Dr. Briggs and the members of the ad hoc committee--had violated Section 1 of the Sherman Act and Section 75-1 of the North Carolina Unfair And Deceptive Trade Practices Act by engaging in a conspiracy to restrain trade. Specifically, appellant alleged that appellees engaged in a group boycott against it, and that they refused to deal with it as part of a conspiracy to prevent the renewal of its contract to provide physician services to the emergency room at the Medical Center. Sandcrest's complaint sought damages and reasonable attorney's fees and costs.
 
 
 4
 Appellees filed motions to dismiss under Rule 12(b)(1) and (6), asserting that the complaint failed to allege a sufficient nexus between the alleged conspiracy and its impact on interstate commerce. Sandcrest filed a motion to amend the complaint to add additional allegations regarding a nexus with, and effect on, interstate commerce. Appellees subsequently filed a joint motion for summary judgment asserting, inter alia, immunity from suit pursuant to the Local Government Antitrust Act of 1984. On May 6, 1987, in response to a motion by appellees, the district court ordered a stay of all discovery. On July 10, 1987, the court denied appellant's request for limited relief from the stay order. On July 24, 1987, appellant filed a second motion to amend the complaint, seeking to add claims for injunctive relief against all appellees.
 
 
 5
 On September 3, 1987, the district court allowed appellant's first motion to amend the complaint, granted summary judgment in favor of all defendants on the ground that the appellees were entitled to immunity under the Local Government Antitrust Act, denied appellant's second motion to amend the complaint, and dismissed appellant's pendent state claim. This appeal followed.II
 
 
 6
 Congress enacted the Local Government Antitrust Act of 1984, 15 U.S.C. Sec. 34, et seq., ("LGAA" or the "Act") in order to broaden the scope of antitrust immunity applicable to local governments. This was a response to the filing of "an increasing number of antitrust suits, and threatened suits, that could undermine a local government's ability to govern in the public interest." H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, reprinted in 1984 U.S.Code Cong. & Admin.News 4602, 4603.[2] The Report of the Senate Committee on the Judiciary, in considering the problem of antitrust suits facing local governments, noted that:
 
 
 7
 More than one hundred Federal antitrust suits seeking treble damages are now pending against cities, counties, townships and virtually every other type of local government. Dozens of local government activities are being challenged, ranging from zoning decisions to the regulation of garbage collection, airport concessions, and parking lots.
 
 
 8
 S.Rep. No. 593, 98th Cong., 2d Sess. 2 (1984). The Senate Report concluded that it was necessary to enact a statute that would "allow local governments to go about their daily functions without the paralyzing fear of antitrust lawsuits...." Id. at 3. Both the House and the Senate, however, were careful to observe that the immunity being provided to local governments was immunity from suits for damages, and not immunity from suits seeking injunctive relief. See id. at 5-6; H.R.Rep. No. 965, 98th Cong., 2d Sess. 2, reprinted in 1984 U.S.Code Cong. & Admin.News 4602, 4603.
 
 
 9
 It was in the light of the above purpose that, in 1984, Congress enacted 15 U.S.C. Secs. 34-36. Section 35(a) provides, in relevant part, that "[n]o damages ...may be recovered ...from any local government, or official or employee thereof acting in an official capacity." Section 36(a) provides immunity from damages for any person when the claim is "based on any official action directed by a local government, or official or employee thereof acting in an official capacity." Appellant has not appealed the district court's determination that the Hospital System is a local government unit. Therefore, on the antitrust question, we assume that the Hospital System is a government unit and address, in this light, only whether the district court correctly concluded that the other appellees also were entitled to immunity under the Act.[3]
 
 
 10
 * Article Six, Section One of the Hospital System's by-laws provides that the Board of Trustees will employ a "Director" with the "concurrence" of the Board of Commissioners of Cumberland County, and that the Director will be the executive officer of the Board and its official spokesman. (App. at 103). In addition, the Director will assume responsibility, among other things, for the "proper operation and management of [the hospital] " and "[c]omphrensive planning on a continuous basis for the future hospital needs of Cumberland County and development of the ways and means to meet these needs." Id. In the early fall of 1985, the Hospital System entered into a contract with appellee SunHealth for the management of the Medical Center. Pursuant to this contract, John Plyler, an employee of SunHealth, was named Director.
 
 
 11
 Appellant argues that SunHealth is not covered by immunity under the Local Government Antitrust Act because only the Board of Trustees had authority to terminate Sandcrest's affiliation with the hospital and to decide on its replacement, and therefore the actions taken by Plyler were unauthorized and subject to a damage suit. Appellant's claim against SunHealth rests on the announcement by Plyler to the Board of Trustees that "the Sandcrest contract for providing physician services to the emergency room at [the Medical Center] would not be renewed when it expired on February 28, 1986" (app. at 323), and on Plyler's statement to the Board that because the decision had already been made he "saw no need to have the Board of Trustees act on that decision." (App. at 324). Appellant also asserts that Plyler's alleged involvement in the appointment of an ad hoc committee to review bids for Sandcrest's replacement was improper. We disagree and find that SunHealth, acting through its employee Plyler, is entitled to immunity from damages as a "person" engaged in "official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. Sec. 36(a).[4]
 
 
 12
 In interpreting the meaning of the phrase "directed by a local government, or official or employee thereof," we are guided by the statement of the Conference Report to the Local Government Antitrust Act. The Report, explicitly agreed to by both houses of Congress, explains that the phrase "official action directed by" found in Parker v. Brown, 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943) and subsequent cases interpreting it, "shall apply by analogy to the conduct of a local government in directing the actions of non-governmental parties, as if the local government were a state." H.R.Conf.Rep. No. 1158, 98th Cong., 2d Sess. 3, reprinted in 1984 U.S.Code Cong. & Admin.News 4602, 4627.
 
 
 13
 In determining whether anticompetitive conduct engaged in by private parties should be entitled to immunity, the Supreme Court has held that "the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy,' " California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (quoting Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.)), and the anticompetitive conduct "must be 'actively supervised' by the State itself." Id. (quoting Lafayette v. Louisiana Power & Light Co., 435 U.S. at 410, 98 S.Ct. at 1135). The Court has held that to satisfy the "clear articulation" requirement of the state action test it is sufficient if the provisions in question plainly show that the legislature contemplated the kind of action complained of. Town of Hallie v. City of Eau Claire, 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985). Explicit authorization is not required. Id. To satisfy the active supervision prong of the test, it is necessary only for the State to exercise ultimate control over the challenged anticompetitive conduct. Patrick v. Burget, --- U.S. ----, 108 S.Ct. 1658, 1668, 100 L.Ed.2d 83 (1988). In other words, this prong of the test requires that "state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." Id.
 
 
 14
 We find that Plyler's action on behalf of SunHealth meets both prongs of this test. The Hospital System by-laws do not prohibit the Director from recommending the termination of a contractual relationship with an outside medical group or from recommending that the Board enter into a contract for the provision of medical services with a particular association. As Director of the Medical Center, Plyler's level of involvement in the operation and improvement of the Medical Center's emergency room services was consistent with his broad authority and responsibility under the Hospital System's by-laws. See supra at 1142. Although appellant focuses on the fact that it would have been consistent with the by-laws for the Executive Committee or medical staff to have become involved in this matter, the by-laws do not delegate such responsibility either explicitly or exclusively to either of these groups. We find that action taken by SunHealth and complained of by appellant was authorized under the by-laws and within the contemplation of the Board of Trustees.[5] As to the "active supervision" prong of the test, not only was the Board of Trustees aware of Plyler's activities, it had authority to approve or disapprove of them, and the Board ultimately exercised that authority by considering and approving the award of the emergency room service contract to another group.[6]
 
 
 15
 In light of the record, the district court acted properly in granting summary judgment on the issue of SunHealth's immunity under the LGAA.
 
 B
 
 16
 Dr. Briggs, another appellee, was Chief of Staff of the hospital and a member of the Board of Trustees. Clearly he was an employee of a local government. Appellant argues, however, that Dr. Briggs is not entitled to immunity under the LGAA because he "was acting outside the scope of any authority he might have had as Chief of Staff or as a member of the medical staff...." Appellant's Brief at 32-33. More specifically, appellant asserts that Briggs was not acting "in an official capacity" when he appointed the ad hoc committee to receive and review bids from applicants for the emergency room contract. Appellant argues that whether Sandcrest's contract should be renewed, and provision for adequate medical care in the emergency room at the Medical Center, are matters specifically delegated to the medical staff or to the Executive Committee of the medical staff. We disagree, and find that Briggs had authority to act, and acted, in an official capacity in appointing the ad hoc committee.
 
 
 17
 The Hospital System by-laws provide that the Board of Trustees "shall assure that the physicians and dentists granted practice privileges in the hospitals shall organize into a medical and dental staff under staff by-laws approved by the Board of Trustees." (App. at 105). The "Medical Staff By-laws" provide that the Chief of Staff "shall serve as the chief administrative officer of the Medical Staff" (app. at 231), and that his duties include: (i) acting in coordination and cooperation with the Director in all matters of mutual concern within the hospital; (ii) appointment of committee members to all standing, special, and multi-disciplinary medical staff committees except the Executive Committee; and (iii) reporting to the Board of Trustees on the performance and maintenance of quality with respect to the medical staff's delegated responsibility to provide medical care. (App. at 231).
 
 
 18
 It is true that the by-laws provide that the duties of the Executive Committee include representing and acting on behalf of the medical staff, providing a liaison between the medical staff, the Director and the Board of Trustees, and making recommendations on hospital management matters to the Board of Trustees through the Director. But, contrary to appellant's assertion, nothing in the by-laws indicates that the Executive Committee has exclusive authority to establish committees or that the Chief of Staff is prohibited from establishing such committees in furtherance of his duties as the chief administrative officer of the medical staff. Appellant is correct that the by-laws do not affirmatively grant the Chief of Staff "the independent responsibility for making any decisions or recommendations regarding the delivery of medical care at the hospital." Appellant's Brief at 14-15. But we think, in view of the broad authority necessarily granted the Chief of Staff, it would be unreasonable to assume that he could act only pursuant to explicit authorization.
 
 
 19
 Our position that an affirmative grant of explicit authority is not required for an employee or government official to be acting in an official capacity under the LGAA is consistent with the position taken by the Second Circuit. See Montauk-Caribbean Airways, Inc. v. Hope, 784 F.2d 91, 94 (2d Cir.1986). The Second Circuit based its conclusion on a finding that, in light of the legislative history, Congress intended that the phrase "acting in an official capacity" be given broad meaning. Id. We believe that, on its face, the phrase "acting in an official capacity" includes those lawful actions, undertaken in the course of a defendant's performance of his duties, that reasonably can be construed to be within the scope of his duties and consistent with the general responsibilities and objectives of his position. This interpretation is also supported by the legislative history.[7]
 
 
 20
 In the instant case, Briggs merely set up an ad hoc committee to review, assess, and recommend to the Board of Trustees a final disposition on the awarding of a contract to an emergency room service group. Moreover, appellant's various complaints allege that Briggs' appointment of an ad hoc committee was carried out "in combination with the Board of Trustees." (App. at 7, 52, 173). Significantly, neither Briggs nor the ad hoc committee made a final decision on the awarding of the contract. As we have noted, the Board of Trustees considered and approved the contract with Coastal Emergency Services, Inc. on January 22, 1986. (App. at 313). We conclude that Briggs' conduct was well within the scope of his official responsibilities as the chief administrative officer of the medical staff. No genuine issue of material fact exists to justify the denial of summary judgment on this question.
 
 C
 
 21
 The members of the ad hoc committee are appellees in this case based solely on the fact that they served on the committee. Appellant argues first that these private doctors are not entitled to summary judgment on the issue of immunity under Section 36 because their appointment to the committee was unauthorized. Appellant also contends that there is a factual issue as to whether the committee's activities were taken pursuant to a clearly articulated government policy with active supervision by the local government, an official, or an employee of the local government. We find these contentions to be without merit.[8]
 
 
 22
 As discussed previously, Dr. Briggs was acting in his official capacity when he appointed the members of the ad hoc committee, and appellant has alleged that the Board of Trustees participated in setting up such a committee. See supra at 1145. Also, this committee's function was purely advisory. It is clear that the Board of Trustees possessed the power to supervise and review the work of the ad hoc committee, and, in fact, the Board actively exercised that power by approving the recommendation of the committee at its meeting on January 22, 1986. (App. at 313).
 
 
 23
 Appellant argues finally on this issue that there is a factual dispute as to "whether the private defendants exerted so much influence on the Board of Trustees ... that the decision not to renew Sandcrest and to employ Coastal can be seen as effectively those of the private defendants." Appellant's Brief at 33. But appellant's initial complaint and the first and second amended complaints explicitly allege that the members of the ad hoc committee, "acting in combination with the Board of Trustees, Briggs and Plyler, secretly determined not to renew Sandcrest's contract...." (App. at 8, 52, 173) (emphasis added). The complaints are devoid of any allegation that the private defendants controlled the decision of the Board of Trustees, and the record contains no evidence from which it could be inferred that the ad hoc committee exercised undue influence over the Board of Trustees.
 
 
 24
 The district court properly granted summary judgment on the issue of immunity as to all appellees.
 
 D
 
 25
 Appellant makes a final argument on the issue of immunity for SunHealth, Briggs, and the ad hoc committee members. It argues that, even if appellees' conduct may be considered in a technical sense to have been undertaken within the scope of their authority and under adequate supervision, the LGAA does not protect them. Appellant insists that appellees were participants in an unauthorized conspiracy, and therefore, in reality, their actions were unauthorized and outside the scope of the LGAA's protection.
 
 
 26
 If this view were accepted, the fundamental purpose underlying the LGAA's immunity provisions would be substantially undercut. See infra at 1148. The basic actions challenged by appellant were the failure to renew its contract to provide emergency room services and the selection of a competitor to provide such services. It must be conceded that hospitals lawfully may make management decisions of this kind, and that the making of such decisions are within the scope of authority of the hospital and its board of trustees. Appellant's argument that allegations of a conspiracy convert otherwise authorized conduct into unauthorized conduct would require consideration of whether the subjective motives or intentions of appellees were to benefit themselves rather than the hospital. The LGAA makes no provision for consideration of a defendant's motives, and an allegation that an act was done pursuant to a conspiracy is akin to an allegation that it was done in bad faith or with malice. Cf. Dorman v. Higgins, 821 F.2d 133, 139 (2d Cir.1987) (claim that a probation officer prepared a false presentence report was properly dismissed on grounds of immunity).
 
 III
 
 27
 Appellant argues that, even if summary judgment was appropriate in light of the present record, it was improperly prejudiced by its inability to obtain discovery necessary to oppose the motion. Appellant asserts that without discovery it had little or no access to important facts relating to the authority of the "private defendants" and the specifics of the process by which Sandcrest was forbidden to compete for the renewal of its contract.
 
 
 28
 We recognize that to determine whether government officials or employees were acting in an official capacity, plaintiffs, in this type of case, must have access to the facts that are relevant to the scope of authority vested in those officials and employees. Also, in order to determine whether the conduct of a private "person" was "directed" by a local government or an official or employee thereof, a plaintiff is entitled to know the facts relevant to assessing the degree of supervision exercised by government officials or employees over the actions of that person. In this case, however, appellant has failed to demonstrate that it was prejudiced by the district court's stay of discovery. The relevant facts were available. Appellant had in its possession the affidavit of an eye witness to the meeting of the Board of Trustees where Plyler spoke about not renewing Sandcrest's contract with the hospital. (App. at 322-325). It also had knowledge of the fact that Dr. Briggs, acting in combination with the Board of Trustees, appointed an ad hoc committee to evaluate and recommend a new emergency room service group, that the ad hoc committee carried out this function, and that the Board of Trustees acted on its recommendation. Moreover, Sandcrest had access to the by-laws of the medical staff and the Hospital System, and the record contains the relevant minutes of the Board of Trustees meetings. The appellant is not entitled to further discovery merely because the relevant evidence fails to support his claim. The discovery process should not become merely a "fishing expedition." Cf. MacKnight v. Leonard Morse Hospital, 828 F.2d 48, 52 (1st Cir.1987).
 
 
 29
 Discovery is of particular concern when immunity defenses under the LGAA are at issue. This statute was enacted in 1984, in the words of Congressman Seiberling, "to free our local government officials of the burden of antitrust damage suits so that they may govern in the public interest." 130 CONG.REC. H8470 (daily ed. August 6, 1984) (statement of Rep. Seiberling). See supra at 1142. Appellant nevertheless contends that the LGAA was enacted only to protect local governments from the damages actually awarded and not to protect local governments from the suits themselves. In making this argument, appellant correctly points out that Congress sought to preserve the right of a private individual to sue for injunctive relief. See, e.g., S.Rep. No. 593, 98th Cong., 2d Sess. 6-7 (1984); H.R.Rep. No. 965, 98th Cong., 2d Sess. 18, reprinted in 1984 U.S.Code Cong. & Admin.News 4602, 4619. Appellant is incorrect, however, when it states that in providing immunity only from damages, Congress was unconcerned with protecting local governments, and their officials and employees, from the burden of defending damage suits. As Congressman Rodino, a principal sponsor of the bill, noted at the time the House was considering passage of the LGAA:
 
 
 30
 [T]here has, in the last 6 years, been a striking increase in the number of private antitrust suits brought against local governments. Although few of these suits have resulted in judgments against local governments, the costs of litigation and the widespread concern with antitrust liability, including the possibility of treble damage judgments, may have severely undercut local officials' ability to govern in the public interest.
 
 
 31
 Id. at H8474 (emphasis added).
 
 
 32
 The Supreme Court's decision in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) provides guidance as to how courts should approach a suit for damages under the LGAA. Harlow involved a suit for civil damages against senior aides and advisors of the President of the United States who were alleged to have participated in a conspiracy to violate the constitutional and statutory rights of the plaintiff. The Court held that these officials were entitled to immunity from damage suits if their conduct did not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known. Id. at 818, 102 S.Ct. at 2738. In discussing the need to provide qualified immunity to government officials, the Court explained:[I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty--at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.
 
 
 33
 Id. at 814, 102 S.Ct. at 2736 (emphasis added). The Court added that the objective immunity standards it was setting forth "should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Id. at 818, 102 S.Ct. at 2738. The rationale of the Harlow decision applies to antitrust suits against local governments and their officials or employees.[9] The evidence contained in the record before us is more than adequate to justify the district court's determination, and it is difficult to conceive of any evidence that appellant could have introduced to undermine this conclusion.
 
 
 34
 The standards for determining whether appellees acted in an official capacity, or were directed by government officials or employees acting in an official capacity, are objective ones. As previously discussed, these standards do not include a consideration of the defendant's intentions. The court considers only the objective questions: (i) whether, in light of the authority invested in a local government, its officials or employees, the actions complained of were lawful and taken within the scope of their authority, see supra at 1145; or (ii) whether, if the defendant is not a local government official or employee, the actions were directed by a local government or one of its officials or employees acting within the scope of his authority. See supra at 1143. An inquiry into a defendant's subjective intent would, in many cases, require broad-ranging discovery and a trial on the merits. Accord Harlow v. Fitzgerald, 457 U.S. at 815-817, 102 S.Ct. at 2736-2737. This would be incompatible with the underlying purpose of the LGAA, that is to protect such defendants not only from damages but also from the expense and time required to litigate such a case.
 
 
 35
 In view of the allegations contained in the complaint and the facts that were available on the motion for summary judgment before the district court, it cannot be said that the district court abused its discretion in deciding the motion for summary judgment without allowing appellant further discovery.
 
 IV
 
 36
 Finally, appellant argues that the district court abused its discretion by refusing to allow appellant leave to amend its complaint to include a claim for injunctive relief. Appellant emphasizes that Federal Rule of Civil Procedure 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Moreover, although a district court's decision to deny leave to amend a pleading rests within its sound discretion, this Circuit has held that denial of leave to amend a complaint must be based on "a showing of prejudice, bad faith, futility, or dilatoriness associated with the motion." Ward Electronics Service v. First Commercial Bank, 819 F.2d 496, 497 (4th Cir.1987). Under the facts of this case, we conclude that the district court did not abuse its discretion in denying the motion.
 
 
 37
 Appellant's motion to add a claim for injunctive relief to its complaint was its second motion to amend the complaint. This motion was made 18 months after the last event giving rise to the causes of action in this case, more than 8 months after the filing of the initial complaint, and five months after the filing of the first motion to amend the complaint. And yet, the motion at issue does not seek to add more particularized or newly discovered facts to the complaint or to plead a different cause of action. Rather, it seeks merely to add a request for an additional remedy that appellant was or should have been aware of from the outset. For at least 8 months appellant was content to litigate this case based solely on a claim for damages. As a result, in formulating their litigation strategy, appellees were justified in concentrating on an immunity defense. Their various discovery motions and the joint motion for summary judgment were prepared within the context of a damage suit only. In fact, appellant's second motion to amend the complaint followed on the heels of appellees' well-supported joint motion for summary judgment based on immunity under the LGAA. Thus, the proposed amendment appears to have been an after-thought by appellant, possibly prompted only by the concern that it would lose on the summary judgment motion. Cf. Witmeyer v. Kilroy, 788 F.2d 1021, 1024 (4th Cir.1986).
 
 
 38
 Moreover, based on the allegations of the complaint, it is difficult to understand how the injunctive relief sought by appellant would substantially further the vindication of its rights. Appellant's request for an order "prohibiting the defendants from engaging in anticompetitive conduct in the future" (app. at 183), is overly broad. Moreover, neither the allegations contained in the complaint nor the evidence of record support an inference that appellant needs an order compelling the Hospital System to give it "sufficient notice" or to "allow [it] to submit a bid" upon the expiration of Coastal's contract. Id.
 
 
 39
 Therefore, in light of the facts that: (i) appellant appears to have been dilatory in filing the second motion to amend the complaint, and (ii) the proposed amended complaint fails to allege facts sufficient to demonstrate that justice favors allowing appellant to assert its claim for injunctive relief, we hold that the district court did not abuse its discretion in denying appellant leave to amend his complaint for a second time.
 
 V
 
 40
 The judgment of the district court granting summary judgment in favor of appellees on the issue of immunity under the Local Government Antitrust Act of 1984 and denying appellant's second motion to amend the complaint is affirmed.
 
 
 
 [1]
 Documents in the record contain references to the Board of Trustees of Cumberland County Hospital System, Inc. and the Board of Trustees of Cape Fear Valley Hospital, Inc. It is clear, however, and not disputed, that these Boards are one and the same. See App. at 86-89
 
 
 [2]
 In Community Communications Co., Inc. v. City of Boulder, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) and City of Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court narrowed the scope of immunity from suit available to local governments under the Parker doctrine
 
 
 [3]
 As this issue is dispositive, we do not reach the substantial questions whether the alleged anticompetitive conduct had an effect on interstate commerce or whether appellant has adequately alleged a "conspiracy" under Section 1 of the Sherman Act, 15 U.S.C. Sec. 1
 
 
 [4]
 The record does not contain sufficient information for us to determine whether SunHealth can be classified as an "employee" of the Hospital System for purposes of immunity under Section 3 of the LGAA. It may be that, due to the fact that its relationship with the Medical Center was through a management contract, SunHealth cannot be classified as an employee. Nevertheless, we need not resolve this issue because, as stated above, we find that SunHealth was entitled to immunity from damages under Section 4 of the LGAA
 
 
 [5]
 These facts also compel the conclusion that Plyler's conduct amounted to "official action" within the meaning of Section 36
 
 
 [6]
 Appellant's amended complaint explicitly alleges that all the appellees, including the Board of Trustees of the Hospital System, participated in the refusal to renew Sandcrest's existing contract and the refusal to allow it to bid for an additional term. App. 51-53. The affidavit of Dr. Meek, a former member of the Board of Trustees, makes clear that Plyler did not advise the Board that it lacked authority to countermand his decision not to renew Sandcrest's contract. He merely stated that "he saw no need to have the Board of Trustees act on that decision." App. 323-324. In fact, Meek, as a member of the Board, voiced his opposition to Plyler's decision not to renew Sandcrest's contract, and resigned. Despite Meek's arguments, the Board acquiesced in Plyler's decision, and it approved and authorized the replacement of Sandcrest. It is clear that the Board had and exercised ultimate control over the conduct of Plyler complained of by appellant
 
 
 [7]
 The original House version of the LGAA provided immunity for claims based on the "official conduct of a local government." See, e.g., H.R. 6027, 98th Cong., 2d Sess. Sec. 3(a), 130 CONG.REC. H8469-8470 (daily ed. August 6, 1984). "[O]fficial conduct of a local government" was defined as "any action or inaction of a local government, or its officials, employees or agents, that [they] could reasonably have construed to be within the ... authority of such local government." Id. at Sec. 2(2). The Judiciary Committee House Report explains: "The definition of official conduct allows room for good faith errors by local government officials in conducting the public business." H.R.Rep. No. 965, 98th Cong., 2d Sess. 20-21, reprinted in 1984 U.S.Code Cong. & Admin.News 4602, 4621
 Although the term "official conduct of a local government," and its definition, were replaced with the undefined phrase "official capacity" in the final version of the LGAA, the House legislative history informs our construction of the phrase "official capacity" by highlighting the concerns of the legislature in drafting the Act. Moreover, the term "official capacity" was contained in the Senate version of the bill, see, e.g., S. 1578, 98th Cong., 2d Sess. Sec. 2(b)(1), 130 CONG.REC. S13574 (daily ed. October 4, 1984), and the Senate Judiciary Committee Report explains: "The intent of [this] provision is to insure that local government officials performing their normal, lawful functions will not be personally responsible for damages when the local government itself is not." S.Rep. No. 593, 98th Cong., 2d Sess. 8 (1984). This definition is broad and consistent with the House legislative history.
 
 
 [8]
 As with SunHealth, we need not determine whether the individual doctors who made up the ad hoc committee were officials or employees of the county because the immunity provided by Section 4 of the LGAA is dispositive
 
 
 [9]
 Although Harlow involved qualified immunity from damages and the LGAA provides absolute immunity when the terms of the statute are met, the important point is that a court should strive to resolve the immunity issue as early as possible, with a minimum of expense and time to the parties. This is necessary in order to further the purpose underlying the provision of immunity