CAPITAL FREIGHT SERVICES,
INC., Plaintiff,

v.

TRAILER MARINE TRANSPORT COR-
PORATION, and Puerto Rico Maritime
Shipping Authority and Puerto Rico
Marine Management, Inc., Defendants.

No. 87 Civ. 8107 (PNL).

United States District Court,
S.D. New York.

Nov. 10, 1988.

Filed Jan. 6, 1989.

Herzfeld & Rubin, New York City, for plaintiff.

Pavia & Harcourt, New York City (Richard L. Mattiaccio of counsel), McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La. (Dando B. Cellini, J. Forrest Hinton, Alexander M. McIntyre, Jr., of counsel) for defendant Trailer Marine Transport Corp.

Morgan Lewis & Bockius, New York City (James W. Harbison, Jr., New York City, Mario F. Escudero, Michael S. Kelly, Dennis N. Barnes, Michael F. Clayton, Thomas J. Woodford, Washington, D.C., of counsel), for defendants Puerto Maritime Shipping Authority and Puerto Rico Marine Management, Inc.

## OPINION AND ORDER

LEVAL, District Judge.

Defendants Trailer Marine Transport Corporation ("TMT"), Puerto Rico Maritime Shipping Authority ("PRMSA"), and Puerto Rico Marine Management, Inc. ("PRMMI") move pursuant to Fed.R.Civ.P. Rule 12(b)(6) to dismiss the amended complaint for failure to state a claim upon which relief can be granted.

## BACKGROUND

This is an action under section 1 of the Sherman Act, 15 U.S.C. § 1, and state tort law. The case involves allegations of price fixing, market allocation and other anticompetitive conduct in the ocean freight transportation market between the mainland United States and Puerto Rico.

The plaintiff, Capital Freight Services, Inc., arranges for the carriage of freight by water common carriers but does not itself own and operate the trucks and vessels used in transporting goods between the United States and Puerto Rico. As such, it is a non-vessel-owning common carrier ("NVOCC"). The defendants, TMT and PRMSA, are vessel-owning common carriers ("VOCC") which carry a substantial portion of the containerized freight between Puerto Rico and the United States. TMT is a Delaware corporation. PRMSA is a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico. Defendant PRMMI is alleged to act as agent for PRMSA in connection with the PRMSA's activities as a carrier by water between Puerto Rico and the United States.[1] It is a Delaware corporation with its principal place of business in New Jersey. The amended complaint refers to PRMSA and PRMMI collectively without distinguishing between the acts of the two.

From January 1985 until September 1987, Capital Freight was engaged in the arranging for carriage of containerized freight between the United States and Puerto Rico. During that period, it utilized the services of TMT to carry freight on the water leg of the United States–Puerto Rico route. The complaint alleges that through careful analysis of TMT's publicly-filed tariffs, Capital Freight was able to gain a competitive advantage over other carriers, including PRMSA, and to offer rates which were less than the rates typically charged to shippers by TMT and PRMSA for freight of a given type, weight, and point of origin. By the end of 1986, plaintiff had developed a substantial number of corporate customers including former customers of PRMSA.

Plaintiff alleges that the defendants engaged in a number of illegal acts in connection with the operation of the United States–Puerto Rico route for containerized freight. It alleges that the defendants conspired to restrict price competition between themselves, to maintain tariff rates at arti-

---

**1.** Plaintiff alleges that shippers who utilize PRMSA's services deal with PRMMI when arranging for shipments of freight and that the terms and conditions of shipments are arranged through PRMMI.

ficially high levels, and to refrain from soliciting each other's customers. The defendants allegedly filed substantially identical tariffs, simultaneously increased rates in the tariffs, and regularly met to discuss tariff rates.

Plaintiff further alleges that the defendants took various anticompetitive actions against Capital Freight as a result of Capital Freight's success in winning over former customers of PRMSA who then utilized TMT carriage arranged by plaintiff for the water leg of the Puerto Rico–United States voyage. PRMSA threatened TMT with a price war unless TMT exercised tighter control over the prices that Capital Freight's customers paid for shipments. TMT then took the following actions to disrupt Capital Freight's business: (1) TMT caused auditors from its parent corporation, Crowley Maritime Corporation, to perform an extraordinary audit of Capital Freight's records and to threaten plaintiff with $170,000 in additional charges unless plaintiff became less competitive with the defendants; (2) TMT caused a collection agent to bill plaintiff thousands of dollars for alleged underpayments; (3) at PRMSA's urging, TMT advised plaintiff that it could no longer use TMT to do business with a former customer of PRMSA; (4) TMT delayed delivery of plaintiff's shipments by opening and inspecting them on a discriminatory basis; (5) TMT advised plaintiff's clients that Capital Freight was committing unlawful acts and was in poor financial condition; and (6) TMT arbitrarily cancelled the line of credit it had extended to Capital Freight and demanded cash in advance for future services with the intent to injure plaintiff. As a result of the defendants' actions, Capital Freight alleges it lost all of its business in the Puerto Rican trade which had constituted 90% of its total income and profit.

Upon these facts, Capital Freight asserts: (i) antitrust claims against all defendants under section 1 of the Sherman Act, 15 U.S.C. § 1, and (ii) state law claims against TMT for tortious interference with business relations and slander. Capital Freight seeks damages of at least $7,000,-000 multiplied by three on its antitrust claims and at least $10,000,000 on its state law claims.

Defendants move to dismiss on the grounds that the action against them is barred by the state action doctrine, the Local Government Antitrust Act, 15 U.S.C. §§ 34–36, and the filed rate doctrine announced in *Keogh v. Chicago & Northwestern Ry Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) and reaffirmed in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed. 2d 413 (1986). TMT argues that in the event the Sherman Act claim is dismissed, the state law claims should be dismissed for lack of jurisdiction.

## DISCUSSION

On a motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the allegations of the complaint as true and construe all inferences in plaintiff's favor. *Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir. 1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985). An action may be dismissed under Fed.R.Civ.P. Rule 12(b)(6) only when " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Philips Business Systems, Inc. v. Executive Communications Systems, Inc.*, 744 F.2d 287, 290 (2d Cir.1984) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

### A. *The Keogh Doctrine*

TMT, PRMSA and PRMMI argue that the filed rate doctrine of *Keogh v. Chicago & Northwestern Ry Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) and *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed. 2d 413 (1986) requires dismissal. In *Keogh*, the Supreme Court held that a shipper could not maintain suit under the Sherman Act against its carriers for conspiring to file arbitrary and unreasonable rates with the Interstate Commerce Commission.

The Court reasoned that approval of the rates by the ICC established the legal rights between shippers and carriers, *id.* 260 U.S. at 163, 43 S.Ct. at 49, and that a contrary rule would controvert the nondiscrimination principle underlying the Interstate Commerce Act by effectively allowing a shipper to seek illegal rebates through claims under the antitrust laws. The Court also reasoned that any injury suffered by the shipper would be speculative because of the difficulty proving either that the ICC might have approved lower rates and/or that the cost of the high rates was actually borne by the shipper rather than the ultimate consumer. The *Keogh* holding was reaffirmed by the Supreme Court in 1986 in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 106 S.Ct. 1922.

■ In both *Keogh* and *Square D,* the plaintiffs were shippers of cargo who alleged that the defendant carriers engaged in conspiracies to maintain high tariff rates which would injure plaintiffs as shippers. Capital Freight argues that the *Keogh* doctrine applies only to suits of shippers and not to those of competitor-carriers. Plaintiff argues that it is bringing suit as a competitor, rather than as a customer, of TMT and PRMSA and is therefore not covered by *Keogh.* I agree with plaintiff's argument.

Although it has not been overruled, the *Keogh* doctrine has also not been extended beyond its precise holding. The *Keogh* doctrine has been limited by recent adjudications, and in particular has been restricted to claims by customers, rather than competitors. In *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 83 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), the Court held that a tariff filing does not immunize a regulated company from antitrust scrutiny where the filed tariff has been disapproved by the regulatory agency. *See also Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785, 820 (2d Cir.1983) ("a tariff filing does not immunize a regulated entity from antitrust scrutiny"); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 929 (2d Cir.1981) ("Disapproved tariffs provide no immunity when, as here, the regulatory agency expressly refuses to commit itself pending investigation").

More pertinently, in *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921 (2d Cir.1981), the Court of Appeals held that "an anticompetitive practice embodied in a tariff may violate the antitrust laws if it ... impacts upon competitors as opposed to customers." *Id.* at 929. Various municipalities which provided retail electric services complained that the defendant utility companies filed excess rates for power with intent to monopolize the retail market. The court found the *Keogh* doctrine applicable to federal power regulation but stated that the doctrine did not bar suits for money damages where the plaintiffs "were competitors as well as customers." *Id.* at 929. The basis for the doctrine was the avoidance of discrimination among customers. *See also Pinney Dock & Transport Co. v. Penn Central Corp.,* 838 F.2d 1445, 1455 (6th Cir.1988) (construing *City of Groton* as holding that "*Keogh* does not apply when the plaintiff is in competition with the defendant"), *cert. denied,* — U.S. —, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). The Court of Appeals made a similar suggestion in *Square D.* 760 F.2d 1347, 1356 (2d Cir.1985) (different considerations apply where "suit [is] by competitors rather than users of the service"), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

In addition, in *Essential Communications Systems, Inc. v. American Telegraph & Telephone Co.,* 610 F.2d 1114 (3d Cir.1979), the Third Circuit reached a similar result. It held that although the *Keogh* doctrine was applicable to federal communications regulation, it did not bar a suit by a corporation engaged in the distribution of telephone station equipment charging the defendant, ATT, with monopolizing the distribution of telephone service equipment through rates filed with the FCC. The court stated that the *Keogh* doctrine "ha[d] little or nothing to do with ATT's duties under the antitrust laws toward its competitors...." *Id.* at 1121. Noting that the suit would have been barred if it had been brought by a custom-

er of the Bell System for excess costs imposed by the filed tariff, the court held that the suit could be maintained because "the plaintiff is not suing in the capacity of a customer for communications services." *Id.* at 1122. Where the plaintiff is a competitor, "[t]here is no ... conflict ... between the section 4 Clayton Act remedy and the antidiscrimination purposes of the filed tariff rule." *Id.*

The Supreme Court has repeatedly held that implied exemptions to antitrust liability are strongly disfavored. *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963); *see National Gerimedical Hospital & Gerontology Center v. Blue Cross of Kansas City,* 452 U.S. 378, 388–89, 101 S.Ct. 2415, 2421–22, 69 L.Ed.2d 89 (1981); *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 218, 932, 86 S.Ct. 781, 785, 15 L.Ed.2d 709 (1966). Implied repeals are found only where there is a "clear repugnancy between the antitrust laws and the regulatory system," *United States v. National Ass'n of Securities Dealers, Inc.,* 422 U.S. 694, 719–20, 95 S.Ct. 2427, 2443, 45 L.Ed.2d 486 (1975); *see Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975); *Northeastern Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76, 82–83 (2d Cir. 1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982), and an activity may be subject to antitrust scrutiny even after it has been approved by a regulatory agency. *See California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); *United States v. Radio Corporation of America,* 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959); *cf. Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973) ("Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws."); *Marnell v. United Parcel Serv.,* 260 F.Supp. 391, 400 (N.D.Cal.1966).

In his opinion for the Court of Appeals in *Square D,* Judge Friendly stated that the *Keogh* doctrine should be reconsidered in light of the principles that implied exemptions from the antitrust laws are disfavored and that competitors are not the intended beneficiaries of ICC regulation. He found that the four arguments on which Justice Brandeis relied in the *Keogh* opinion no longer justified the doctrine because of subsequent legal developments. The concern that the recovery of antitrust damages would operate as a rebate to produce discrimination among shippers was muted by the Supreme Court's later recognition of the difference between a carrier's passing money to a favored shipper and a court's deciding that the shipper suffered antitrust injury; the availability of an advisory opinion from the ICC obviated the concern that an antitrust action would require the carrier to prove that a hypothetical lower rate was lawful; the third reason for the *Keogh* doctrine, the view that a plaintiff cannot recover damages it was able to pass on to its customers, had been rejected by the Supreme Court; and finally ICC review did not obviate antitrust concerns. *Id.* at 1352–54. Judge Friendly observed that in "suits by competitors rather than users of the service many of the considerations relied upon in *Keogh* would not apply." *Id.* at 1356. The Court of Appeals stopped short of overruling *Keogh* because it was a decision of the Supreme Court, but advanced a firm suggestion that the high court consider doing away with a no longer justified rule.

The Supreme Court declined the invitation because "the *Keogh* rule has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some six and a half decades," *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 1930, 90 L.Ed.2d 413 (1986), because " 'it is more important that the applicable rule of law be settled than that it be settled right,' " *id.* 106 S.Ct. at 1931 (quoting *Burnet v. Coronado Oil & Gas Co.,* 285 U.S. 393, 406, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting)); and because modification of so long standing a statutory construction would be more appropriately left to Congress. *Id.* It

stated: "*Keogh* simply held that an award of treble damages is not an available remedy for a *private shipper* claiming that the rate submitted to, and approved by, the ICC was the product of an antitrust violation. Such a holding is far different from the creation of an antitrust immunity...." *Id.* 106 S.Ct. at 1929 (emphasis provided). It praised Judge Friendly's "characteristically thoughtful and incisive opinion," *id.* at 1930, but declined to overturn a doctrine that Congress had left standing for over six decades.

Although the Supreme Court's ruling in *Square D* saved *Keogh* from extinction, it did not breathe a new expansive energy into the doctrine. The decision represents simply an unwillingness to deliver a coup de grace to a weak and forcefully criticized doctrine because that function might be more appropriately carried out by Congress. That holding does not justify expansion of the doctrine to nullify competitor suits.

This conclusion is not altered by the Supreme Court's decision in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945). In that case, the State of Georgia, on behalf of its citizens and on behalf of a state-owned railroad company, brought suit against a cartel of railroad companies alleging conspiracy to monopolize. The complaint alleged that the defendants' high rates had discriminated against Georgia's products and held the Georgia economy in a state of arrested development. The Supreme Court construed the cause of action "to charge a conspiracy among the defendants to use

coercion in the fixing of rates and to discriminate against Georgia in the rates which are fixed." *Id.* at 462, 65 S.Ct. at 728. The claim for money damages was thus barred by *Keogh*, which the Court stated as holding that "[t]he legal rights of a shipper against a carrier in respect to a rate are to be measured by the published tariff." *Id.* at 453, 65 S.Ct. at 724. The case does not stand for the broad proposition, argued by defendants, that *Keogh* bars claims for money damages based on injuries caused the plaintiff as competitor.

I do not follow the Sixth Circuit's decision in *Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1457 (6th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988), that *Keogh* applies to claims by competitors as well as customers. *Pinney Dock* correctly observes that the Supreme Court in *Square D* declined to disavow *Keogh. Id.* at 1456. But to say that *Keogh* is still good law is not to say that it should be extended. Nothing in *Square D*, which was a suit by a customer, speaks to the issue whether the *Keogh* doctrine bars suit by a competitor. One district court in this circuit, ruling on the issue after the Supreme Court's decision in *Square D*, has concluded that *Keogh* does not apply where the Sherman Act violation is directed against a competitor rather than a customer. *Delaware & Hudson Ry Co. v. Consolidated Rail Corp.*, 654 F.Supp. 1195 (N.D.N.Y.1987).[2] Moreover, the Sixth Circuit's argument that ICC review "assumes that the pro-competition policies of the antitrust laws have been taken into account," 838 F.2d at 1457, is somewhat inconsistent with the

---

**2.** Several district court prior to the Supreme Court's decision in *Square D* espoused the competitor-customer distinction. In *Transkentucky Transportation R.R. v. Louisville & Nashville R.R. Co.*, 581 F.Supp. 759 (E.D.Ky.1983), the court held that a claim by three coal transportation companies against two railroads for discriminating against the companies in their rate levels was not barred by *Keogh* because the plaintiffs alleged a scheme to destroy them as a competitor. *Id.* at 767; *see also Frontier Enterp., Inc. v. Amador Stage Lines, Inc.*, 624 F.Supp. 137 (E.D.Cal.1985) ("*Keogh* is not applicable ... for the reason that plaintiffs are competitors of defendants."); *Marnell v. United Parcel Service of America*, 260 F.Supp. 391 (N.D.

Cal.1966) ("The Court in *Keogh* expressly recognized that a rate combination of regulated carriers might be illegal and subject to attack under the antitrust laws even though the rates were authorized by the Commission. It merely held that an antitrust suit by a shipper to recover damages—the difference between the rates as filed and approved and the allegedly reasonable rates which the shipper would otherwise have enjoyed—would not lie because adjudication of such an issue under the antitrust laws would collide with the provisions of the Interstate Commerce Act empowering the Commission to determine the reasonable and presumably lawful rates which carriers must charge to all shippers alike....").

Supreme Court's statement in *Georgia v. Pennsylvania Railroad Co.*, 324 U.S. 439, 460, 65 S.Ct. 716, 727, that "the Interstate Commerce Act does not provide remedies for the correction of all the abuses of rate-making which might constitute violations of the anti-trust laws," and is at odds with the Second Circuit's assertion that "an anticompetitive practice embodied in a tariff may violate the antitrust laws if it ... impacts upon competitors as opposed to customers." *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921, 929 (2d Cir.1981).

Defendants argue that Capital Freight is in fact a customer-shipper rather than a competitor. They cite a series of cases defining the relationship between NVOCCs and VOCCs and analogously, freight forwarders and common carriers, for the purposes of the Interstate Commerce Act and the Shipping Act of 1984. These cases establish that under the Shipping Act of 1984, a NVOCC, such as Capital Freight, is considered a shipper in its relationship with a VOCC, such as PRMSA and TMT. 46 U.S.C.App. § 1702(17), (18). A VOCC may not discriminate in rates in favor or against NVOCCs as opposed to other shippers or enter into rate agreements with them as they would with other VOCCs. *See New York Foreign Freight Forwarders & Brokers Ass'n v. Interstate Commerce Commission*, 589 F.2d 696, 706 (D.C.Cir.1978); *cf. Chicago, Milwaukee, St. Paul & Pac. R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 476, 69 S.Ct. 692, 697, 93 L.Ed. 817 (1949) (citing *Interstate Commerce Commission v. Delaware L. & W.R. Co.*, 220 U.S. 235, 31 S.Ct. 392, 55 L.Ed. 448 (1911)). These cases, however, define relationships for the purposes of the Shipping Act of 1984, and not for the antitrust laws or the *Keogh* doctrine where different policy considerations arise. They do not govern.

A NVOCC "has some of the characteristics of both carrier and shipper." *Chicago, Milwaukee, St. Paul & Pac. R. Co. v. Acme Fast Freight, Inc.*, 336 U.S. 465, 467, 69 S.Ct. 692, 693, 93 L.Ed. 817 (1949). Courts have held that whether a business is a competitor of another turns not on whether one is in some respects a customer but whether with respect to the aim of the anticompetitive conduct alleged in the complaint they compete in the same market. *See Litton Systems, Inc. v. American Telephone & Telegraph Co.*, 700 F.2d 785 (2d Cir.1983); *City of Groton v. Connecticut Light & Power Co.*, 662 F.2d 921 (2d Cir.1981) (wholesale customer is a competitor of electrical utility if they compete for retail customers); *Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 610 F.2d 1114 (3d Cir.1979) (telephone company is competitor of plaintiff in business of distributing Code-a-Phone even though it provides telephone service to plaintiff). Thus, for example, in *Delaware & Hudson, supra*, 654 F.Supp. 1195, even though the plaintiff rail carrier was the customer of the defendant rail carrier with respect to the portion of its route on which the defendant had rail tracks, the court held that the plaintiff was also a competitor and could maintain an antitrust action for the damage to its business caused by defendant's attempts to monopolize. And in *Pinney Dock*, 838 F.2d 1445, where a dock operator—customer of railroads—sued a dock-owning railroad for the railroad's anticompetitive acts aimed at the plaintiff's dock, the court considered the action a competitor suit (although concluding that competitor suits were also barred).

Reading the complaint liberally, as I must at this juncture, it is not barred by the *Keogh* doctrine. It is true that TMT and PRMSA are common carriers by water subject to regulation by the Interstate Commerce Commission. The Interstate Commerce Commission has the exclusive authority under Part II of the Interstate Commerce Act, 49 U.S.C. § 10521, to regulate the marine segment of a joint motor/water through rate between the United States and Puerto Rico, *see Puerto Rico Maritime Shipping Authority v. Interstate Commerce Commission*, 645 F.2d 1102 (D.C.Cir.1981), and under part I of the Interstate Commerce Act, 49 U.S.C. § 10501, to regulate the marine segment of the joint rail/water through rate between the United States and Puerto Rico. *See*

*Trailer Marine Transport Corp. v. Federal Maritime Commission*, 602 F.2d 379 (D.C.Cir.1979).[3] The allegations of the complaint, however, are geared to injuries that plaintiff suffered as a competitor rather than as a customer of defendants. They are not barred by *Keogh*.

The complaint alleges that Capital Freight provided transportation for shippers of containerized freight, Complaint ¶ 6; that it competed with PRMSA and TMT in providing services to shippers, *id.* ¶ 10; that it successfully attracted former customers of PRMSA. *Id.* ¶ 11; and that the defendants combined and conspired to "drive Plaintiff out of the business of providing for carriage of containerized freight to and from Puerto Rico," *id.* ¶ 19, precisely the business that the defendants were engaged in. It seeks damages not for the increased rates it was forced to pay, but for lost sales and profits and the going concern value of its destroyed business. *Id.*

I therefore find that Capital Freight's complaint is a competitor suit, not barred by the *Keogh* doctrine.[4] The motion to dismiss based on *Keogh* is denied.

### B. *Local Government Antitrust Act of 1984*

Defendants contend that the Local Government Antitrust Act of 1984 ("LGAA"), 15 U.S.C. §§ 34–36, bars this action for damages against them. The LGAA shields municipalities, other governmental instrumentalities, and persons who act at the direction of governmental instrumentalities from monetary claims arising under the antitrust laws. Passed in the wake of the Supreme Court's decision in *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70

L.Ed.2d 810 (1982), which allowed antitrust suits against municipalities unless their actions were in furtherance of a clearly articulated and affirmatively expressed state policy, the LGAA reflects a concern that municipal taxpayers not be unfairly assessed and governmental activity not be inordinately chilled by private antitrust damage awards that would be ultimately drawn from general revenues. *See Sandcrest Outpatients Services, P.A. v. Cumberland County Hospital System, Inc.*, 853 F.2d 1139, 1142 (4th Cir.1988) (Powell, J.); *Driscoll v. City of New York*, 1987–1 Trade Cas. (CCH) ¶ 67,646, at 60,854 (S.D. N.Y.1987) [1987 WL 13903]; H.R.Rep. No. 98–965, 98th Cong., 2d Sess. 11, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4612. In terms, the Act bars antitrust damage awards against "any local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 35(a); *see Montauk–Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 94 (2d Cir.1986). A local government thus need not show its activities were sanctioned by the state to invoke immunity under the LGAA. *See Palm Springs Medical Clinic, Inc. v. Desert Hosp.*, 628 F.Supp. 454 (C.D.Cal. 1986). In addition, the LGAA bars the award of damages for "any claim against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 36(a).

I conclude that the LGAA bars antitrust damages against PRMSA but not necessarily against TMT and PRMMI. The complaint against TMT and PRMMI therefore cannot be dismissed for failure to state a claim. In addition, to the extent that the complaint seeks damages from any of those entities under state law interference with business relations and slander, those

---

**3.** Under section 2 of the Intercoastal Shipping Act, 46 U.S.C.App. § 844, the Federal Maritime Commission has authority to require the filing of tariffs by water carriers for allwater routes between the United States and Puerto Rico. *Trailer Marine Transport*, 602 F.2d at 394. The complaint alleges and the parties have assumed that rates are filed with the ICC and thus have not addressed what difference regulation by the FMC might make.

**4.** I note further that at best the *Keogh* doctrine would protect the defendants only against that portion of the complaint based on the fixing of rates. To the extent that the complaint alleges other anticompetitive conduct, tortious interference and slander, the *Keogh* doctrine would have no application. *See Pinney Dock & Transport Co. v. Penn Central Corp.*, 838 F.2d 1445, 1457 (6th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).

causes of action are not barred by the LGAA.

### 1. PRMSA

█ PRMSA is a "local government" within the meaning of the LGAA, and therefore entitled to the immunity from damages that the Act provides.[5] The term "local government" is defined under the LGAA as:

> (A) a city, county, parish, town, township, village or any other general function governmental unit established by State law, or

> (B) a school district, sanitary district, or any other special function governmental unit established by State law in one or more States.

15 U.S.C. § 34(1). The overwhelming majority of cases that have thus far been decided under the LGAA have involved claims for immunity by counties, towns, cities, or other general function governmental units.[6]

The "special function governmental unit" provision is designed to protect those political subdivisions of the state, which though they do not have broad governmental powers, nonetheless serve a public function in the provision of a particular service. *See Palm Springs Medical Clinic, Inc. v. Desert Hosp.,* 628 F.Supp. 454, 457 n. 2 (C.D.Cal.1986). The legislative history of the Act indicates the protected political units include: "planning districts, water districts, sewer districts [and] mosquito control districts." *See id.; Trustees of A.J. Bremen Realty v. City of Boston,* 1985–1 Trade Cas. (CCH) ¶ 66,520 (D.Mass.1985) [1985 WL 6083]; H.R.Rep. No. 98–965, at 20–21, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4621–22. These units are only representative, however, and the language and legislative history of the LGAA is explicitly inclusive, not exclusive. *See Palm Springs Medical Clinic, Inc. v. Desert Hosp.,* 628 F.Supp. 454, 457 (C.D. Cal.1986).[7] Thus the courts have applied the LGAA to a public hospital center providing hospital services in areas with inadequate care, *Palm Springs Medical Center, Inc. v. Desert Hosp.,* 628 F.Supp. 454 (C.D. Cal.1986), a city hospital building authority, *Huron Valley Hospital v. City of Pontiac,* 612 F.Supp. 654, 664–65 (E.D.Mich.1985), and to the Massachusetts Port Authority, *Trustees of A.J. Bremen Realty v. City of Boston,* 1985–1 Trade Cas. (CCH) ¶ 66,520 (D.Mass.1985).

---

**5.** Capital Freight does not contest defendant's contention that the Commonwealth of Puerto Rico is a state for the purposes of the LGAA. Puerto Rico has been considered a state for the purposes (among others) of the state action doctrine, *Caribe Trailer Systems, Inc. v. Puerto Rico Maritime Shipping Auth.,* 475 F.Supp. 711 (D.D. C.1979), *aff'd,* No. 79–1658 (D.C.Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1355, 67 L.Ed.2d 339 (1981); *International Telephone & Telegraph Corp. v. General Telephone & Elec. Corp.,* 351 F.Supp. 1153, 1229 (D.Haw.1972), *mod. on other grounds,* 518 F.2d 913 (9th Cir.1975), and federal preemption analysis, *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corp.,* —— U.S. ——, 108 S.Ct. 1350, 1353, 99 L.Ed.2d 582 (1988).

**6.** *See, e.g., Skepton v. County of Bucks,* 613 F.Supp. 1013 (E.D.Pa.1985); *Hillman Flying Serv., Inc. v. City of Roanoke,* 652 F.Supp. 1142 (W.D.Va.1987), *aff'd,* 846 F.2d 71 (4th Cir.1988); *S. Kane & Son, Inc. v. W.R. Grace & Co.,* 623 F.Supp. 162 (E.D.Pa.1985); *Huron Valley Hosp., Inc. v. City of Pontiac,* 612 F.Supp. 654 (D.C. Mich.1985), *aff'd in part, dism. in part,* 792 F.2d 563 (6th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986); *Pontarelli Lim-*

*ousine, Inc. v. City of Chicago,* 623 F.Supp. 281 (N.D.Ill.1985); *Woolen v. Surtran Taxicabs, Inc.,* 615 F.Supp. 344 (N.D.Tex.1985), *aff'd,* 801 F.2d 159 (5th Cir.1986), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1567, 94 L.Ed.2d 759 (1987); *TCI Cablevision, Inc. v. City of Jefferson, Missouri,* 604 F.Supp. 845 (W.D.Mo.1984); *Fisichelli v. Town of Methuen,* 653 F.Supp. 1494, 1502 (D.Mass. 1987).

**7.** The House Report states: "Examples of special purpose political subdivisions included within the definition are planning districts, water districts, sewer districts, irrigation districts, drainage districts, road districts, and mosquito control districts. Such a subdivision would have a geographic jurisdiction that is not contiguous with, and generally substantially smaller than, that of the State that established it. The definition, however, would encompass special purpose governmental units that operate in more than one State. For example, regional planning boards, environmental organizations, or airport or port authorities may be established in two or more States." H.R.Rep. No. 98–965, 98th Cong. 2d Sess. 19–20 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4620– 21.

PRMSA is analogous to many of those institutions that Congress and the courts have indicated are protected by the LGAA. PRMSA was established as a governmental instrumentality of the Commonwealth of Puerto Rico, tit. 23 § 3054, to maintain "a maritime transportation system for the benefit of the people of the Commonwealth, and for the protection of their health and welfare." *Id.* § 3052. The exercise of its powers is deemed to "constitute[ ] an essential governmental function." *Zapata Gulf Marine Corp. v. Puerto Rico Maritime Shipping Auth.,* 682 F.Supp. 1345, 1351 (E.D.La.1988) (holding that LGAA is applicable to PRMSA) (quoting Act § 3058); *cf. Trustees of A.J. Bremen, supra,* 1985–1 Trade Cas. at 65,581 (discussing fact that Massachusetts Port Authority is created as a "public instrumentality" and is deemed to perform "essential governmental functions"). Its members are all public officers, appointed by the Governor and confirmed by the Senate. *Id.* § 3054. Perhaps most importantly, in light of the LGAA's purpose in protecting taxpayers from being assessed with antitrust damage awards, *see Driscoll v. City of New York, supra,* 1987–1 Trade Cas. at 60,855, PRMSA is required by statute to pay into the Commonwealth Treasury its total net income less adequate operating reserves on an annual basis. Thus any antitrust damage award assessed against PRMSA would be ultimately paid by the taxpayers of the Commonwealth of Puerto Rico. *See Zapata Gulf Marine Corp., supra.*

■ Capital Freight argues that PRMSA does not come within the definition of a "special function governmental unit" under the LGAA because it is not geographically defined and because it does not engage in traditional public activities but rather pro-

prietary activities. Capital Freight's suggested commercial-governmental distinction, however, was considered and rejected by Congress. In passing the LGAA, it declined to adopt an approach that would have made antitrust damage immunity turn upon whether the challenged governmental action was "sovereign or commercial in character." *See* H.R.Rep. No. 98–965 at 14, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 4615. In doing so, it noted the views of Justice Frankfurter that the commercial-governmental distinction was a "'quagmire that has long plagued the law of municipal corporations.'" *Id.* at 4616 n. 23 (quoting *Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955)). The courts have thus extended LGAA immunity to such institutions as hospital centers, *Palm Springs Medical Center, Inc. v. Desert Hosp.,* 628 F.Supp. 454 (C.D.Cal.1986), port authorities, *Trustees of A.J. Bremen Realty Co. v. City of Boston,* 1985–1 Trade Cas. (CCH) ¶ 66,520 (D.Mass.1985), and a local town-operated airport, *Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91 (2d Cir. 1986), that might be said to engage in proprietary activities in light of the fees they charge and their lack of regulatory authority. Congress rejected the commercial-governmental distinction adopting a definition for eligibility for immunity based on status as a governmental instrumentality and effect on taxpayers rather than on purpose.[8]

■ Capital Freight's argument that PRMSA is deprived of LGAA immunity because it does not have a geographically defined jurisdiction is without merit. First, there is no requirement that the governmental instrumentality have a geographi-

---

**8.** Moreover, if it were necessary to reach the issue, I would hold that PRMSA engages in a governmental function. Its activities have been deemed by the legislature of the Commonwealth of Puerto Rico to be "an essential governmental function." *Cf. City of St. Louis v. Praprotnik,* —— U.S. ——, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). It was enacted to maintain the maritime transportation system for the benefit of the people of the Commonwealth. Those opera-

tions are of tremendous importance to the people of Puerto Rico. Because of its insular status, "ocean freight costs exert a potentially disruptive influence of all aspects of Puerto Rico's economy." *Caribe Trailer Systems v. Puerto Rico Maritime Shipping Auth.,* 475 F.Supp. 711, 714 (D.D.C.1979), *aff'd,* No. 79–1658 (D.C.Cir. 1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1355, 67 L.Ed.2d 339 (1981).

cally defined jurisdiction.[9] Furthermore, PRMSA's jurisdiction is geographically defined, although broad: it has a mandate to maintain "a complete, reliable and economical maritime transportation system for cargo and passengers between Puerto Rico and abroad."

As a governmental instrumentality, PRMSA is immune from any antitrust attack for any action undertaken "in an official capacity." 15 U.S.C. § 35. The Congress and the Second Circuit have instructed that this phrase is to be interpreted in an expansive manner. *Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 94 (2d Cir.1986); H.R.Rep. No. 98–965, at 20–21, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4621–22. There need not be a specific affirmative grant of a state's authority to the instrumentality and the state need not have contemplated the anticompetitive conduct charged. It is sufficient that the instrumentality's actions are within its authority and do not violate any criminal laws. *Montauk–Caribbean Airways,* 784 F.2d at 94–95.[10]

The conduct with which PRMSA is charged falls within this broad definition of official conduct. In creating PRMSA, the legislature of the Commonwealth of Puerto Rico stated its intention that PRMSA "acquire[ ] and operate[ ] shipping lines and terminal facilities as a public service," and that PRMSA provide "maritime transportation between Puerto Rico and abroad ... *wholly* or partially, as long as the public interest, health and welfare of its citizens may require." Statement of Motives. PRMSA has the authority 1) to acquire and operate shipping lines, Tit. 23 § 3061; 2) "to determine, fix, impose, charge, alter and collect reasonable rates, fees and charges ... for the use of any undertakings or for the services rendered thereby," *id.* § 3055(m); 3) "to perform all acts and things necessary or desirable to carry out the powers granted to it," *id.* § 3055(u), including all the general corporate powers such as the right to contract and the right to enter into agreements.

The allegations that PRMSA conspired to restrict price competition, maintain tariff rates at artificially high levels, and refrain from soliciting each other's customers, and that it threatened TMT with a price war unless TMT exercised tighter control over the prices that Capital Freight's customers paid for shipments, charges activity that PRMSA would have the lawful right to do under its grant of authority. These would all fall within PRMSA's broad authority to operate shipping lines, set rates, and take all necessary and proper actions.

To the extent that plaintiff argues that actions taken in concert with private parties and with an anticompetitive motive are not covered by the LGAA, that argument is unavailing. *See Montauk–Caribbean Airways,* 784 F.2d 91, 94 (2d Cir.1986); *cf. Llewellyn v. Crothers,* 765 F.2d 769, 774 (9th Cir.1985) (Kennedy, J.) ("The availability of ... immunity ... does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* [*v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) ] and the authorities which inter-

---

9. As PRMSA argues, the LGAA is designed to protect entities that by Capital Freight's definition would not be geographically-defined. The Act includes "special purpose governmental units established by state law in one or more states" in the definition of "local government," 15 U.S.C. § 34(1)(B), and the legislative history evinces an intention to protect port authorities. There is no principled distinction between the state-owned and operated port authority and the state-owned and operated shipping authority which services the port. Because the port authority is clearly protected by the LGAA, *see Trustees of A.J. Bremen Realty Co. v. City of Boston,* 1985–1 Trade Cas. (CCH) ¶ 66,520 (D.Mass.1985), so must also PRMSA be entitled to LGAA immunity.

10. In a recent case, Justice Powell sitting on the Fourth Circuit agreed that "official capacity" should be interpreted broadly, stating with respect to a related provision: "the phrase 'acting in an official capacity' includes those lawful actions, undertaken in the course of a defendant's performance of his duties, that reasonably can be construed to be within the scope of his duties and consistent with the general responsibilities and objectives of his position." *Sandcrest Outpatient Services, P.A. v. Cumberland County Hospital System, Inc.,* 853 F.2d 1139, 1145 (4th Cir.1988) (discussing 15 U.S.C. § 36(a)).

pret it."); *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9 (1st Cir.1987); *Hancock Industries v. Schaeffer,* 811 F.2d 225, 234 (3d Cir.1987). All plaintiff has alleged is that PRMSA took various official actions that discriminated against Capital Freight with intent to injure Capital Freight for its pricing policies. Those allegations do not take PRMSA out from under LGAA immunity.

### 2. PRMMI and TMT

PRMMI and TMT also argue that they are entitled to immunity from claims for damages. They cite section 4 of LGAA, which precludes antitrust damage actions "against a person based on any official action directed by a local government, or official or employee thereof acting in an official capacity." 15 U.S.C. § 36(a). PRMMI argues that as PRMSA's agent, it acted by legal definition at the direction of PRMSA. In a letter to the Court, TMT argues that insofar as the complaint alleges that TMT engaged in anticompetitive activity as a result of PRMSA's threat to start a price war with TMT, *see* Amended Complaint ¶ 16, TMT also acted at the direction of PRMSA.

Section 4 was added to the Act at conference. The conference managers explained that the phrase "official action directed by" a local government was borrowed from the Supreme Court's opinion in *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), holding that anticompetitive conduct at the direction of a state is immune from antitrust scrutiny. The conference report states that the phrase used in the context of "state action" immunity from the antitrust laws should be applied "by analogy to the conduct of a local government in directing the actions of non-governmental parties, as if the local government were a state." H.Con.Rep. No. 98–1158, 89th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Admin. News 4602, 4627; *see Sandcrest Outpatient Services, P.A. v. Cumberland Coun-*

*ty Hospital System, Inc.,* 853 F.2d 1139, 1143 (4th Cir.1988).

■ The issue whether a person or entity has acted at the direction of a local government is manifestly one of fact. In *Sandcrest Outpatient Services, supra,* the court affirmed the entry of summary judgment in favor of a defendant-employee of a private hospital management concern who as Director of the County Hospital had terminated the hospital's affiliation with a professional association of physicians. The court found in addition to the fact that the action of the Director was authorized under the bylaws of the Hospital and within the contemplation of the Board of Trustees, that the Board was aware of the Director's actions and exercised ultimate authority in connection with them. *Id.* at 1144. In *City Communications, Inc. v. City of Detroit,* 660 F.Supp. 932, 936 (E.D.Mich.1987), by contrast, the court denied summary judgment to private defendants who had been granted an exclusive cable television franchise on the grounds that disputed fact issues remained as to whether the defendants were really acting under official supervision.

■ Based on the face of the complaint, the action against TMT and PRMMI is not barred by the LGAA. Plaintiff has alleged in the Complaint and the Memorandum in Opposition to the Motion to Dismiss that with respect to the anticompetitive conduct PRMMI deviated from its duties as agent to PRMSA. Plaintiff also alleges that TMT might have been acting at the threat of PRMMI and not PRMSA. However improbable plaintiff's allegations may be, there is no indication from the amended complaint that PRMSA actively reviewed the actions PRMMI allegedly took on its behalf or that PRMMI did not exercise undue influence over PRMSA. *Sandcrest Outpatients Services, P.A.,* 853 F.2d at 1143. The motion to dismiss the actions against PRMMI and TMT on LGAA grounds must therefore be denied.[11]

---

11. I therefore do not reach the issue raised by Capital Freight whether the actions of the Commonwealth of Puerto Rico in sanctioning pri-

vate anticompetitive activity violates the dormant commerce clause. *Compare Reeves, Inc. v. Stake,* 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d

## C. *The State Action Doctrine*

Defendants also argue that they are immune from suit under the state action doctrine of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). PRMSA contends that as an instrumentality of the Commonwealth of Puerto Rico and as an agency which is carrying out the policy of the government of Puerto Rico, it is entitled to immunity under the *Parker* doctrine. TMT and PRMSA argue that if PRMSA is immune from suit under the state action doctrine that immunity must be extended to them. Plaintiff argues that the state action doctrine should not be applied because the actions of PRMSA are contrary to its legislative mandate and violate the dormant commerce clause of the constitution. *See H.P. Hood & Sons, Inc. v. DuMond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949).

The state action doctrine is an implied exemption from the antitrust laws based on respect for the role of the states in a federal system. *See 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 725, 93 L.Ed.2d 667 (1987). On the assumption that Congress would have spoken more clearly had it intended to interfere with the state's execution of governmental policy, the Supreme Court has held that the antitrust laws do not apply to such anticompetitive acts as "derive[ ] [their] authority and ... efficacy from the legislative command of the state." *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943). The doctrine is of uncertain breadth. Read most expansively, the state action doctrine might seem to permit the states to claim antitrust immunity for egregiously anticompetitive commercial conduct. Congress's prerogative to regulate interstate commerce, however, limits the anticompetitive conduct that the states may protect. *See California Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 106, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) ("the national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is

244 (1980) *with H.P. Hood & Sons, Inc. v. Du-Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865

essentially a private price-fixing arrangement"). At the least, to be entitled to *Parker* immunity, the defendant must show that "the challenged restraint [is] 'one clearly articulated and affirmatively expressed as state policy' [and] the policy [is] actively supervised by the state itself." *Id.* at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (plurality opinion)); *see Patrick v. Burget,* —— U.S. ——, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988); *324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 725, 93 L.Ed.2d 667 (1987); *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.,* 790 F.2d 1032, 1043 (2d Cir.1986). Precisely because the state action doctrine is an implied exemption from the antitrust laws based on the protection of *legitimate* state activity, it is also questionable whether a state may avail itself of the protection of the doctrine when it engages in conduct that would unconstitutionally impair the flow of interstate commerce or violate the dormant commerce clause.

It is unnecessary to decide the precise scope of the state action doctrine or whether it shields PRMSA, PRMMI and TMT from liability. Whatever immunity the defendants would have under the state action doctrine it appears they already have under the LGAA.

Under the state action doctrine, PRMSA might be entitled to immunity if it acted pursuant to a " 'clearly articulated and affirmatively expressed' state policy to displace competition." *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985); *see Cine 42nd Street Theater Corp. v. Nederlander Organization,* 790 F.2d 1032 (2d Cir.1986); *see also Interface Group, Inc. v. Massachusetts Port Auth.,* 816 F.2d 9, 13 (1st Cir.1987); *Deak–Perera Hawaii, Inc. v. Department of Transportation,* 745 F.2d 1281 (9th Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 820 (1985); *Commuter Transp. Systems Inc. v. Hills-*

(1949).

*borough County Aviation Auth.,* 801 F.2d 1286 (11th Cir.1986). Because plaintiff seeks only damages and not injunctive or equitable relief, PRMSA is already afforded complete relief from plaintiff's claims.

■ Private parties such as TMT and PRMMI are generally exempt from antitrust liability under the state action doctrine when the challenged activities are undertaken pursuant to a clearly articulated state policy and are " 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (quoting *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (Brennan, J.)), or, in some circumstances, where the state agency was the effective decisionmaker in the alleged anticompetitive conduct or "actively encouraged" the anticompetitive conduct. *See Cine 42nd Street Theater Corp. v. Nederlander Organization,* 790 F.2d 1032, 1048 (2d Cir.1986); *Riverview Investments, Inc. v. Ottawa Community Improvement Corp.,* 769 F.2d 324, 330 (6th Cir.), *modified on other grounds,* 774 F.2d 162 (6th Cir.1985); *Vartan v. Harristown Development Corp.,* 661 F.Supp. 596, 604 (M.D.Pa. 1987); *City Communications, Inc. v. City of Detroit,* 660 F.Supp. 932 (E.D.Mich. 1987). This standard is virtually identical to the standard for the immunity of private parties under the LGAA. Just as the pleadings do not establish immunity for TMT and PRMMI under the LGAA, so also they cannot establish immunity for those parties under the state action doctrine.[12]

■ Finally, the state action doctrine only confers immunity from suits under the antitrust laws. It does not provide immunity from state law causes of action. Thus to the extent that plaintiff seeks relief from TMT under non-antitrust causes of action, its complaint is not barred by the state action doctrine.

### CONCLUSION

PRMSA's motion to bar award of antitrust damages against it is granted under the Local Government Antitrust Act. TMT and PRMMI's motions to dismiss on *Keogh,* state action and LGAA grounds are denied.

SO ORDERED.

---

12. I note defendants' argument that entitlement to state action immunity may be made out by a lesser showing that their participation in the alleged anticompetitive activity was "reasonably contemplated by the legislature," *Cine 42nd Street Theater Corp. v. Nederlander Org.,* 790 F.2d 1032, 1048 (2d Cir.1986). The anticompetitive action alleged in *Cine 42nd Street,* the awarding of theater rights to private parties, is activity that by definition was undertaken with the active involvement and encouragement of the state. *See also Charley's Taxi Radio Dis-*

*patch v. Sida of Hawaii,* 810 F.2d 869, 878 (9th Cir.1987) (private taxi organization awarded exclusive contract by state agency protected by state action doctrine). Even if some lesser standard is applicable (an issue which I do not now decide), there is still an issue of fact as to whether PRMMI and TMT's anticompetitive conduct was reasonably contemplated by the legislature. Plaintiff has alleged as an alternative theory of liability that TMT and PRMMI engaged in an anticompetitive conspiracy without PRMSA's participation or encouragement.